**SANDURA COMPANY, Petitioner,**

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 15221.

United States Court of Appeals
Sixth Circuit.

Dec. 30, 1964.

Harold F. Baker, Washington, D. C., John Bodner, Jr., Victor P. Kohl, Jr., Washington, D. C., on brief; Howrey, Simon, Baker & Murchison, Washington, D. C., of counsel, for petitioner.

Emerson K. Elkins, Atty., Federal Trade Commission, Washington, D. C., James McI. Henderson, General Counsel, J. B. Truly, Asst. General Counsel, on brief, for respondent.

Before O'SULLIVAN, Circuit Judge, McALLISTER, Senior Circuit Judge, and WILSON, District Judge.

O'SULLIVAN, Circuit Judge.

This matter involves the petition of Sandura Company for review of parts of an order of the Federal Trade Commission which found Sandura guilty of unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45. The condemned conduct consisted of resale pricefixing arrangements and the imposition of territorial limitations upon the distributors through whom Sandura distributed its vinyl floor covering products, Sandran and Crown Vinyl. Sandura does not appeal from that part of the Commission's order finding illegal its fixing of resale prices at both the distributor and dealer levels. Under the condemned distribution system, Sandura assigned defined geographical areas to its various distributors and such areas became "closed territories" in the sense that each distributor was permitted to sell Sandura products only within his assigned territory and only to retail dealers located therein. We deal here primarily with the question whether such arrangements, as initiated and maintained by Sandura, violate Section 5 of the Act. We hold that they do not and, accordingly, deny enforcement of the Commission's order in this regard. Sandura's challenge to certain remedial aspects of the Commission's order will be examined following exposition of our reasons for disagreeing with the Commission's condemnation of Sandura's "closed territory" system.

Forbidding one Sandura distributor from selling in the territory of a neighbor Sandura distributor restrains competition between them. The assertion or finding of this obvious truth, however, does not by itself make out a case of "unfair methods of competition" foreclosing further inquiry into the legality of such arrangements. Just as the "rule of reason" has been read into the Sherman Act by Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 62, 31 S.Ct. 502, 55 L.Ed. 619, 646 (1911) to allow some competitive practices which restrain competition in some degree, not every method of competition which involves some restriction on competition is an "unfair method of competition" under the F.T.C. Act. FTC v. Motion Picture Adv. Serv. Co., 344 U.S. 392, 396, 73 S.Ct. 361, 97 L.Ed. 426, 430–431 (1953); FTC v. Gratz, 253 U.S. 421, 427, 40 S.Ct. 572, 64 L.Ed. 993, 996 (1920); Asheville Tobacco Bd. of Trade v. FTC, 263 F.2d 502, 511 (CA4, 1959). Thus in Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L. Ed. 1199 (1951), it was held that an agreement among *competitors* to divide markets violates our antitrust laws. But in the recent case of White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), the Supreme Court refused to find equally illegal "a *vertical* arrangement by one manufacturer restricting the territory of his distributors or dealers" without the benefit of trial evidence disclosing the time, place and circumstances of the initiation and maintenance of such a system, as well as its purposes and effects. Although Mr. Justice Douglas, writing for the Court in White Motor, stated that "[w]e intimate no view one way or the other on the legality of such an arrangement," and that "the applicable rule of law should be designed after a trial," it is clear to us that under White

Motor the aforesaid bare assertion that Sandura's distributors do not compete with each other will not, standing alone, convict Sandura of violating Section 5 of the F.T.C. Act. Just as the Court was there unwilling to base a finding of illegality on the acknowledged elimination of competition without further examination into the surrounding circumstances, so must we here refuse to find Sandura's arrangements illegal without examining their particular effect on competition *and* the facts offered to justify the resulting restraint. The full facts of a single case are no more sufficient than the pleadings in another case to demonstrate that such restrictions should now be held per se illegal "because of their pernicious effect on competition and lack of any redeeming virtue." See Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). For an understanding of these facts, we must turn to the voluminous testimony taken before a Hearing Examiner whose Initial Decision with Findings of Fact and Conclusions of Law was, in the main, and on the point here involved, affirmed by the Opinion and Final Order of the Commission.

Petitioner asserts that from the whole record containing evidence of the necessity and justification for its system, a finding that such system is illegal either per se or in practice is not supported by the evidence. We address ourselves to this contention.

### I. *Closed Territories.*

1) *Factual Foundation to Sandura's Claim of Justification.*

It would be well at the outset to observe that this is not a case where a powerful producer is employing methods rewarding it with an ever-increasing share of the market for its product. The reverse is true. As detailed hereinafter, Sandura is a relatively small concern competing with and losing ground to the

"giants" of the floor-covering industry.[1] The Commission's opinion recites Sandura's self description as follows: "Respondent is a small, short-line manufacturer in a field dominated by giant firms producing a full line of hard-surface floor coverings."

While Sandura's closed territory system was instituted in 1955, the forces responsible for its adoption had been at work for several years. Prior to World War II, Sandura sold enamel surface, felt base flooring which it made for itself until its plant was destroyed by fire in 1934. Thereafter, it obtained its materials from competing manufacturers. It still depends on large competitors as the only sources for some of the components of its products. Following the war, Sandura worked intensively on developing a new product, Sandran, manufactured by a process pioneered by it. By this process, designs are printed by a rotogravure process on specially prepared paper, which is then covered by liquid vinyl and baked under high, closely controlled temperatures. This printed, coated sheet is then laminated to a felt back to complete the floor covering. This process gives a product which cleans very easily, and which can be produced in a wide variety of patterns superior to those achieved by other methods. Sandran was first marketed in 1949, and, in the words of Sandura's president, it "took off very nicely." Within a short time, however, the company encountered product failures which nearly forced it into bankruptcy. First, mechanical problems in producing consistent quality goods had to be overcome. More serious, trouble occurred with improper treating of the vinyl wear covering which led to yellowing of installed Sandran. By far the greatest difficulty encountered, however, was delamination of the bond between the layers of goods installed or waiting to be installed. Under these difficulties, sales fell from $7,126,000 in 1950 to $3,557,000

---

[1]. In what we say in this opinion, we have no thought of expressing a view that small competitors should be allowed the use of illegal tools to meet the competition of the so-called giants of their industry. Rather, we are concerned with the problem of justification for conduct which may or may not be illegal.

in 1954. Sandura experienced severe operating losses, and its distribution system became badly demoralized.

It was against this background of near bankruptcy, bad product reputation, and loss of distributors that Sandura sought to reestablish its finally perfected Sandran. It had to make a comeback. Sandura's then position was more precarious than that of a newcomer. It was attempting to market a product with an already damaged reputation, even though by then it had eliminated the cause of such reputation. The hearing examiner accepted as a fact that this background made some special inducement necessary to attract distributors. The opinion of the Commission described Sandura's characterization of its then plight as follows:

"When 'product failure' caused respondent's sales to plummet from $7,-000,000 in 1950 to $3,500,000 in 1954, distributors and dealers either dropped Sandran or ceased any serious attempt to promote it. By late 1954 the production difficulties had been substantially overcome, but by that time respondent was in or near insolvency. Distributors, dealers, and the consuming public distrusted Sandran as a result of its recent deficiencies, and respondent lacked the wherewithal to finance an advertising campaign to overcome this sales resistance.

"Respondent's distributor-relations problem, the argument continues, was thus a peculiarly difficult one. Not only did it have to convince distributor prospects to take on a dubious line, but it had to get them to pay for the bulk of the advertising. Since established distributors could not be obtained on these terms, new ones, without prior industry experience, were recruited. But before they would make the necessary heavy investment of capital, prospective distributors required the special inducement of a closed, exclusive territory. They would not spend to advertise and promote an unpopular product without assurance that resulting sales accrued to them."

Neither the examiner nor the Commission found the above description inaccurate, and our own study of the testimony persuades us that such was, indeed, Sandura's position.

Sandura decided upon the closed distributor territories as part of the inducement needed to attract distributors. Aided by its new plans, Sandura embarked upon a program which raised its sales from a 1954 low of $3,557,000 to a 1959 total of $24,001,523. Sales for 1960 and 1961, however, fell to $16,394,061 and $13,718,297, respectively.[2] Several of the distributors contributing to this success were complete newcomers to the hard floor-covering field, and many others had previously entered it only to a minor extent. These distributors engaged in successful selling campaigns and extensive servicing of product complaints. Perhaps their most vital role in the successful comeback of Sandura, however, was their participation in advertising and promotion campaigns which Sandura was unable to finance by itself. Sandura asserts that such distributor cooperation was necessary to its reestablishment; is still necessary to its continued existence as a significant competitive force in the hard floor-covering industry; and was, and remains, unavailable without the grant of closed distributor territories in exchange.

Sandura supported its claim that closed distributor territories were necessary to its survival with an impressive array of testimony. Its general sales manager testified that it could not have existed without distributor advertising and the closed territories required to make that possible. Dr. Robert F. Lanzillotti, author of what is apparently the only de-

2. Sandura has attached its 1962 statement as an appendix to its brief, showing sales of $11,023,041 and a loss before tax credits of $200,119. This information was not before the Commission and, accordingly, may not be considered as a basis for the present decision.

tailed study of the hard surface floor-covering industry, testified that in view of the bad reputation Sandura had to overcome, it could not have made a comeback into the market without effective distributor assistance and closed territories. While there was some unimpressive testimony to the contrary from one witness, distributor after distributor testified they would not have undertaken to distribute Sandran on any terms other than those offered,[3] and there is no indication that even veteran distributors would have engaged in extensive advertising without closed territories. Certainly it is not difficult to understand either the need for advertising a product whose only reputation was unfavorable, or the unwillingness of distributors to undertake such advertising if it would be possible for one distributor to make the sales and take the profits promoted by another's advertising. Particularly is this so since the distributors uniformly advertise Sandran as a product, rather than themselves as distributors.

Even if it is assumed that the offered justification for instituting the system of closed distributor territories is sufficient, there of course remains the question whether their continued use down to the time of the Commission's proceedings can be similarly justified.[4] Sandura relies for continued justification on showings as to the structure of the hard floor-covering industry, renewed competitive difficulties, and the role of the distributor in the over-all marketing and servicing of Sandura products.

In general, the hard surface floor-covering industry is composed of three groups of firms. The "big three," specializing primarily in floor covering, are Armstrong, Congoleum-Nairn, and Pabco (now the Pabco Division of Fiberboard Paper Products Company). Several large diversified firms such as Johns-Manville, Goodyear, and Goodrich also compete in this industry as well as in others. Finally, there are several small firms engaged primarily in the production of floor covering, Sandura among them. In 1947 the FTC published a "Report on the Concentration of Productive Facilities," in which Armstrong Cork, Congoleum-Nairn, and Pabco were shown as owning 92.1% of the assets of corporations in the "linoleum and felt base" industry. These figures were later revised to a range of 77.7% to 84.3% to take account of the fact that not all of the assets of these companies were devoted to linoleum and felt base production. Sandura's expert, Dr. Lanzillotti, applied the same methods to arrive at figures of 77.51% and "around sixty percent" for 1958. Sandura, by contrast, has never owned more than 1½% of the industry assets. Sandura's sales of $19,634,000 amounted to 4.8% of the hard floor-covering industry sales for 1958, the last year for which comparative figures were adduced before the Commission. It is safe to assume, however, that this percentage has fallen with the later decline in Sandura's sales.

It may be assumed that among the primary reasons for the current decline in Sandura sales is the marketing by the giants of the industry, and others, of several new "roto vinyls" to compete with the novel product pioneered by Sandura. Sandura has two process patents which its technical staff does not feel sufficient

3. Both in its opinion and in its brief here, the Commission places emphasis on the fact that many of the questions put to the distributors, and accordingly many of their responses, were couched in terms of "exclusive" rather than "closed" territories. This choice of words is made the basis for an argument that even the distributors themselves would have been satisfied if Sandura had limited its plan to a mere geographic separation of distributors. It is manifest, however, that the distributors were testifying with regard to the situation they knew, where each was affirmatively barred from selling to dealers located within the territory of another distributor. See p. 856, infra.

4. The complaint in this case was served on February 6, 1958. Hearings were had and the trial examiner's initial decision was rendered September 15, 1961. The opinion of the Commission, with one Commissioner dissenting, was rendered June 13, 1962, and its final order was served October 8, 1962.

to prevent the manufacture of essentially identical competing products. As testified by one distributor, "there are lots and lots of vinyls on the market of all kinds purporting to pattern themselves after or in the nature of Sandran." The Commission itself found that the record "lends support" to the view that falling sales are attributable to stiffened competition. In any event, the success enjoyed by Sandura from the end of 1954 through 1959 has not proved permanent.

Against this background, Sandura asserts the need for a devoted distributor system and has attempted to demonstrate both the functions assumed by its distributors and the necessity of closed territories if they are to continue to discharge those functions. The advertising and sales promotion manager testified without contradiction that Sandura still cannot compete in advertising on a national level, and must advertise locally in cooperation with its distributors and occasionally even the retail dealers. As in the past, distributors continue to be willing to undertake product advertising only within closed territories.

Beyond distributor promotion, Sandura's general sales manager testified that even today he doubted whether any of the distributors would be willing to extend warehouse facilities and inventory into any "open" territory without having it closed to them. Again, distributor testimony bears this out and illustrates that closed territories are responsible for more thorough coverage of dealer accounts than Sandura would otherwise enjoy. In the words of one distributor who testified that the Sandura system avoided duplication of effort and resulted in greater coverage of a given territory, "this way we are able to concentrate, and we do a lot of business in little towns, small towns. We don't bypass them. We can back into the hinterland." Certainly the most striking example, however, was given by the South Carolina distributor who testified to doing between $180,000 and $200,000 worth of business in the first full year after having closed to him previously open territory in which he had done $5,000 worth of business on a simple "spot" basis. We do not consider that such increase in business represented any reduction or suppression of either interbrand or intrabrand competition.

The testimony further revealed that Sandura relies heavily on its distributors to service complaints about its products, and that the distributors would be much less willing and active in servicing complaints if dual distribution existed. The purport of all of this testimony is that although Sandura employs salesmen to help its distributors, it depends almost entirely on its distributors to market its products to the ultimate retailers.

One summary of these several aspects of the continued need for closed territories was given by Sandura's general sales manager: "if this program is knocked out we wind up, in my own personal opinion, in the junk heap again, where we started from * * *." A blunter summary was given by two distributors who testified that if another distributor were allowed in their territory, they would give up distributing for Sandura. Hearing Examiner Lewis, however, provided perhaps the most significant summary of the distributor testimony in his simple observation at one hearing that "I think we have got the picture from the distributor's point of view."

2) *Legal Sufficiency of Sandura's Offered Justification.*

As we have already noted, under the Supreme Court's ruling in White Motor Co. v. United States, supra, an "unfair method of competition" in violation of § 5 of the Act is not made out simply by showing that a manufacturer employed a closed territory distribution system. There the White Motor Company's contract with its dealers required that they were "not to sell such trucks except to individuals, firms, or corporations having a place of business and/or purchasing headquarters *in said territory.*" (Emphasis supplied.) White Motor, in the District Court, asserted in opposition to the government's motion for summary judgment that:

"the territorial clauses are necessary in order for appellant to compete with those who make other competitory kinds of trucks; appellant could theoretically have its own retail outlets throughout the country and sell to users directly; that method, however, is not feasible as it entails a costly and extensive sales organization; the only feasible method is the distributor or dealer system; for that system to be effective against the existing competition of the larger companies, a distributor or dealer must make vigorous and intensive efforts in a restricted territory, and if he is to be held responsible for energetic performance, it is fair, reasonable, and necessary that appellant *protect him against invasions of his territory by other distributors or dealers of appellant;* that appellant in order to obtain maximum sales in a given area *must insist that its distributors and dealers concentrate on trying to take sales away from other competing truck manufacturers rather than from each other."* 372 U.S. 256–257, 83 S.Ct. 698. (Emphasis supplied.)

Thus White Motor set forth its reasons and justification for using closed territories. Its offer to prove such facts on trial amounted to an admission of the nature and purpose of its plan. The District Court had held that such proofs would not overcome the per se illegality of the plan. The Supreme Court, however, reversed and we construe its holding to be that the asserted and admitted facts outlined above did not per se make out an illegal method of competition. Justice Douglas stated that the case should be tried because the Court did not "know enough of the economic and business stuff out of which these arrangements emerge * * *" and that the legality or illegality of the White distributor plan (a closed territory arrangement) could not be determined because "[w]e need to know more than we do about the actual *impact of these arrange-*

*ments on competition* * * *."* 372 U.S. 263, 83 S.Ct. 702. (Emphasis supplied.)

The impact of Sandura's closed territory plan on competition has been fully exposed. The proofs in the case disclose no greater impact on competition than the syllogistic statement that since each distributor must stay in his own territory he does not compete with his neighbor-distributor in the latter's assigned area, thereby suppressing competition. No dealer, however, has been subjected to the caprice of his area distributor, and no distributor is shown to have made unreasonable profits. After its high years of recovery, Sandura's system accorded it survival, but its sales declined and its ratio of profits to sales moved downward. Its biggest competitor was at the same time enjoying a reverse experience.

The Hearing Examiner, affirmed by the Commission, found other practices of Sandura, such as pricefixing, violative of Section 5 of the Act. It is quite clear, however, that in finding Sandura's closed territory distribution system illegal he relied upon his own view that such systems were illegal per se. He found support for his view in the District Court opinion in United States v. White Motor Co., 194 F.Supp. 562 (N.D.Ohio 1961), stating "in the opinion of the Examiner the conclusions reached by the [District] court in the White Motor case are correct and have application to the instant proceeding." The examiner further concluded as a matter of law, "Since such joint action [between Sandura and its distributors] involves, in effect, an allocation of territories among distributors, albeit one which has a vertical genesis, it is illegal *per se."* While the opinion of the Commission asserts that whether Sandura's system is illegal per se is "a question we are not compelled to reach" it found support for its holding primarily, if not entirely, in the obvious fact that closed territories do prevent the intrabrand competition that could exist if one Sandura distributor went into another's territory to compete for the custom of a dealer.

We are satisfied that the total evidence in the case showed no further or different restraint of competition, and certainly failed to demonstrate that Sandura's plan had a "pernicious effect on competition," or that it was without "any redeeming virtue." Our observation in this regard is, we think, supported by the Hearing Examiner's Finding of Fact expressed as follows:

> "With respect to respondent's argument that there has been no lessening of competition in the industry as a whole as a result of the establishment of respondent's exclusive distributorship program, *this may be accepted as a fact for the purposes of this proceeding*. It may also be accepted as a fact that *respondent has been strengthened as an economic entity vis-a-vis its larger competitors*. It does not follow, however, that the arrangement has been without its adverse competitive impact. Such impact involves competition *between and among distributors, in the obtaining of* dealer accounts." (Emphasis supplied.)

In view of this acknowledged effect on intrabrand competition, we must inquire whether the total evidence of this case discloses such redeeming virtue in Sandura's plan as to justify it nonetheless. For such inquiry, it is not necessary for us to decide whether as a matter of procedure the admitted fact of Sandura's closed territory plan makes out a prima facie case of illegality casting the burden of proving justification upon Sandura, or whether the burden of proving a violation by Sandura remains with the Commission throughout. Our task is to determine whether on the whole record the Commission's finding that there was not justification for the admitted intrabrand restraint is supported by the evidence.

Sandura asserts that the evidence establishes justification by showing closed territories were necessary to its very survival, and remain necessary if it is to be an effective competitive force in a highly concentrated industry. It further contends that there is nothing in the entire record with its complete disclosure of Sandura's activities and their impact upon competition, from which a permissible inference of "pernicious effect" without any "redeeming virtue" could be drawn. In its opinion in this case, written before the Supreme Court decision in the White Motor case, supra, the Commission rejected the factual sufficiency of this asserted justification without expressly passing on its legal sufficiency. As already noted, the hearing examiner accepted as a fact that Sandura's situation at the end of 1954 "required it to offer distributors some inducement for handling its line." He went on to find, however, that certain of the distributors "preferred greater flexibility" than offered by Sandura's plan, and that others who might have insisted on closed territories "would *probably* settle for less" today. (Emphasis supplied.) The Commission went beyond these findings to rule that it "strains" its "credulity" to suppose many distributors would drop Sandura's products today if their closed territories were again opened up. The Commission also looked to the undisputed high freight costs faced by distributors to find that Sandura's objectives "could be largely attained through the significantly less restrictive device of establishing exclusive distributorships with primary-responsibility territories." In addition, the Commission found there was no showing Sandura has a special need or right to use closed territories "due to its position in the industry." The Commission further ruled that Sandura had not established "a causal relationship" between the use of exclusive territories and prosperity, pointing out that its initial difficulties were caused by product failure, its succeeding good fortune by product success, and its present renewed difficulties by product competition. The final ruling of the Commission which should be noted at the outset is that Sandura is not a failing company.

■ The last two of the Commission rulings just mentioned can be treated summarily. We accept the finding that as of the time of the Commission deci-

sion Sandura was not a "failing company," and agree that this fact may have at least tangential relevance to the question of justification presently before this Court, see White Motor Co. v. United States, 372 U.S. 253, 263–264, 83 S.Ct. 696 (1963). The Commission's finding that Sandura's fortunes have been closely tied to the quality of its products and the competition they have faced is but to state the obvious. The fact, however, that Sandura's distribution system has not prevented a substantial decline in its sales from the high point of 1959, does not prove that such system is not reasonably necessary to survival in its competitive market.

■ The balance of the Commission's findings summarized above represent the heart of the present case. These findings, moreover, must be accepted if they are supported by substantial evidence on the record considered as a whole, Section 5(c) of the Federal Trade Commission Act, 15 U.S.C.A. § 45(c); Timken Roller Bearing Co. v. FTC, 299 F.2d 839, 841 (CA6, 1962), cert. denied, 371 U.S. 861, 83 S.Ct. 118, 9 L.Ed.2d 99 (1962); Evis Mfg. Co. v. FTC, 287 F.2d 831, 835, 848 (CA9, 1961), cert. denied, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 28 (1961). It is axiomatic that no purpose, however reasonable, may be used to justify a restraint of trade greater than the minimum necessary to reasonably attain it. Accordingly, if it were possible to accept the finding that Sandura could achieve at least its present valid purposes by establishing merely de facto closed territories through use of "primary-responsibility" exclusive territories, the Commission's order should be enforced. We believe, however, that the Commission was not justified in its rejection of the great body of uncontradicted testimony that the distributors would not have been willing to undertake the Sandura program without closed territories and would either drop the line or greatly alter their methods if deprived of their closed territories today. It appears to us that the Commission fell into this erroneous position by its misconstruction of the testimony on this subject. The word "exclusive" is sometimes employed to describe a situation where there is only one appointed distributor in a defined geographical area, but without prohibition against an outside distributor selling in the same area. In the "closed" system used by Sandura, each distributor is expressly confined to his own assigned territory. In the examination and cross-examination of the witnesses called, the terms "exclusive" and "closed" were frequently used interchangeably. Because of this, the Commission concluded that at least some of Sandura's distributors might have been satisfied and Sandura's problems met without use of the closed territory system. We are convinced, however, that from a fair reading the only acceptable understanding of the testimony is that the distributors, the company officials and the expert on the hard floor-covering industry were all testifying in terms of Sandura's situation as they knew it. They were talking about the "closed" territory system.

■ Of course, the Commission is not necessarily bound by any incredible self-serving statements that may be made by respondents before it and others interested in maintaining an attacked method of competition merely because they are not formally contradicted. But we are convinced that the entire record in this case supports the apparently reasonable proposition that distributors are unwilling to engage in extensive advertising and promotion of a product if the final sales may be made by another distributor. Accordingly, this testimony should be accepted as fact for purposes of passing upon the sufficiency of Sandura's justification for its distribution system. Further, we do not understand the Commission to reject the testimony that Sandura by itself would be unable to support the extensive advertising campaign presently engaged in without the cooperation of its distributors. Similarly, there has been no rejection of the testimony that the distributors devote much greater effort.

to developing closed territories than they would if other distributors were allowed to enter.

We believe that the cumulative effect of the facts offered is legally sufficient to justify Sandura's use of closed territories. Unless vertical imposition of closed distributor territories were now to be declared illegal per se, it is difficult to imagine a basis for finding an unreasonable restraint of trade at the time Sandura instituted this scheme in 1955. While its spectacular success in the 1955–1959 period may be due to the novelty of its perfected product, it is clear that that product could not have been successfully marketed if Sandura had not been able to attract distributors by the promise of closed territories. Not only would the hard floor-covering market have likely lost a competitive factor which proved the spur to innovation by other manufacturers,[5] but there would also have been no intrabrand competition to stifle. While an original necessity for initiating Sandura's plan does not necessarily supply justification for its continuance, it does show that the initial motivation was proper and conducive to a genuine competitive benefit.

■ Turning to the situation at the time of the Commission proceedings, the hearing examiner accepted it as a fact that Sandura's program had not lessened competition in the hard floor-covering industry as a whole, and indeed that it had strengthened Sandura "as an economic entity vis-a-vis its larger competitors." The Commission may have rejected this finding in its ruling that Sandura had not established a peculiar need or right to use closed territories "due to its position in the industry." It relied primarily, however, on its finding that although Sandura's products "are in substantial competition * * * with other hard-surface covering materials," intrabrand competition among distributors of those products "is important" because "distinctive

dissimilarity" among products "is the hallmark of the industry." For purposes of the present decision, we are willing to agree that significant product differentiation increases somewhat the importance of intrabrand competition between distributors and increases correspondingly the required justification for abolishing it. At the same time, however, we believe that product differentiation increases the importance of successful advertising and promotion to inform the ultimate consumer of the advantages of one differentiated product over another. Such advertising may not presently be essential to the bare existence of Sandura, although the present sales trend suggests it may well be, but certainly it is essential to the continuation of Sandura as a significant competitive force in an industry dominated by firms many times as large. Compare the opinions of the Court and of Mr. Justice Brennan in White Motor Co. v. United States, 372 U.S. at 263, 269, 83 S.Ct. 696. Given the dependence of Sandura on its distributors for much of its advertising program, and given the distributors' unwillingness to cooperate without the quid pro quo of closed territories, we believe justification has been made out.

■ In its brief to this Court, the Commission suggests that the closed territories involved in the present case are not really vertical in origin, but represent merely a plan conceived by the distributors and policed by Sandura. If this contention could be established, the restrictions would, of course, be invalid as a horizontal agreement not to compete, see Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226–227, 59 S.Ct. 467, 83 L.Ed. 610, 620 (1939); Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). Aside from statements by Sandura officials that this scheme had been adopted for the benefit of the distributors, the only real support for this position is a letter to a distributor from the

---

5. Aside from the imminent danger of bankruptcy, it was testified that Sandura had been discussing the possibility of merger with some of its competitors, although no formal agreements were reached.

858

general sales manager stating that "this particular idea did not come from Sandura Company but was requested by sufficient distributors throughout the country that we put it in." In view of the overwhelming evidence that the restrictions were adopted because they were necessary to Sandura's survival, we cannot accept this as substantial evidence that their genesis was really horizontal. We believe it is implicit in the White Motor Co. decision, supra, that the mere fact that distributors refuse to handle a product without closed territories is not sufficient basis for finding a horizontal conspiracy among them.

The Commission placed some reliance upon its own decision in Snap-On Tools Corp., Docket No. 7116, Nov. 1, 1961. Since the Commission's opinion in this case was announced, June 13, 1962, the Seventh Circuit has reversed that decision. Snap-On Tools Corp. v. FTC, 321 F.2d 825 (CA 7, 1963). By that decision, a Commission order prohibiting territorial restrictions was set aside. While Snap-On Tools may be read as lending support to our conclusion here, its facts provide some distinction. The mobile dealers there involved were forbidden to go beyond their assigned territories, but remained free to sell to customers located elsewhere as long as the customers came into the defined territory.

We think it fair to say that after its review of the entire record the Commission and the Examiner found no "pernicious effect" on competition beyond that implied in the unassailable fact that Sandura's system eliminated the abstract possibilities of competition between its distributors. In his Findings of Fact the examiner set forth, without criticism of its validity, Sandura's contention that

"the evidence fails to establish any injury to competition but that, on the contrary, respondent's system of exclusive distribution enabled it, as a small company producing a limited line of floor coverings, to stage a comeback and to become an effective competitor in an industry which is overshadowed by a few large companies."

The examiner's finding that Sandura's distributor restrictions were per se illegal has already been discussed. This approach to the question enabled him to find a violation regardless of the lack of actual pernicious effect and without considering any redeeming virtue, as emphasized by the passage already quoted where he accepted as fact the strengthening of Sandura vis-a-vis its larger competitors and the absence of any injury to competition in the industry as a whole. The only competitive impact which he found "involves competition between and among distributors, in the obtaining of dealer accounts." Neither he, nor the Commission in affirming him, point to any other "economic and business stuff" or any other "impact of these arrangements on competition" out of which to arrive at a conclusion that such distribution plans have " 'a pernicious effect on competition and lack * * * any redeeming virtue.' " White Motor, supra, 372 U.S. at 263, 83 S.Ct. at 702.

Thus at the end of the testimonial road the Commission finds nothing more than what was encompassed by the allegations which were found insufficient, standing alone, to warrant entering a summary judgment in White Motor. The only clear picture that emerges from this record and the findings of the Commission is that closed territories made for the vigor and health of Sandura, increasing the competitive good that flows from *inter*brand competition without any showing of detriment to *intra*brand competition.

In summary, we feel constrained to uphold the legal sufficiency of the justification made by Sandura. We are of the opinion that the Commission's rejection of its sufficiency was without supporting factual foundation. We are satisfied that the record in this case is barren of credible evidence that the public would be benefited by requiring that Sandura distributors be allowed to intrude on each other's territory. The distributors, the

dealers and the public will *best* be served by the continued economic health and competitive existence of Sandura as well as its distributors. We are of the opinion that *on this record,* the only justified conclusion is that elimination of the closed territory arrangement would impair competition, rather than foster it.

The statute here involved prescribes that on our review "[t]he findings of the Commission as to the facts, if supported by evidence, shall be conclusive." § 5(c) of the Act, 15 U.S.C.A. § 45(c). If we must assume that the Commission found as a fact that Sandura's closed territory plan is unreasonable and without justification or any redeeming virtue, it is our holding that such finding is without support in the evidence.

## II. *Involvement of Closed Territories with Price Maintenance.*

 Although the Commission devoted a substantial portion of its opinion to the conclusion that Sandura's closed territorial scheme was an unfair method of competition by itself, it began and ended with express findings that it must in any event be prohibited as part of an over-all scheme for fixing prices at the retail dealer level. Primary reliance is placed on these findings in the present review. It may be accepted as a working premise that if the closed territories were in fact adopted as part of the scheme for maintaining resale prices, the Commission could exercise its remedial discretion to prohibit their use for any purpose. See United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944). But see Virginia Excelsior Mills, Inc. v. FTC, 256 F.2d 538 (CA 4, 1958). The Commission's findings, however, are not supported by substantial evidence on the record considered as a whole.

It is clear that the dealer franchise plan, the method through which retail price maintenance was accomplished, was instituted in 1953, two years prior to institution of the territorial restrictions on distributors, and had proved successful in the areas in which it had been used. It is equally clear, on the other hand, that distributors assisted Sandura in its price maintenance plan, and that the Commission could properly order Sandura to cease enlisting their aid in this effort. Only two ambiguous pieces of evidence, however, indicate that the use of closed distributor territories in any way contributed to the price maintenance plan. These are sufficiently brief to be set out in full in the margin.[6]

Standing alone, these two pieces of evidence might well be sufficiently substantial to support the Commission's position. When set in the context of the record as a whole, however, they are inadequate to support an order prohibiting the use of closed distributor territories for any pur-

---

**6.** A former Indiana distributor testified to the following conversation with Sandura's general sales manager at a meeting of the distributors:

"*Hearing Examiner Lewis.* Well, what was said at the meeting about closed territories and by whom?

"*The Witness.* Well, I believe the party that told me about it was Steve Pohe, and he mentioned it had started at other spots and was working very nicely. * * *

"Q. Was this the closed territories *or franchised dealer* program?

"A. Closed territory *and* the franchised dealers, as I remember, was part of it.

"Q. * * * What was your comprehension as to the purpose of setting up closed territories *and* franchising dealers?

"A. We were trying to establish so dealers would not cut the price, hold a price so that everybody made a fair profit." (Emphasis supplied.)

And in a letter to a dealer in Foxboro, Massachusetts, Sandura's Vice President stated that:

"An important factor in making the Sandran Dealer Franchise program effective is our Sandran Distributor Franchise which assigns to each distributor a specific territory. I am sure you can understand why such a program is quite important for the successful operation of the Dealer Franchise program."

pose. We have already reviewed the evidence which in our view required a finding that the restrictions here involved were properly adopted as a means of reestablishing Sandura's finally perfected products in the face of what would otherwise have been the overwhelming competition of well established companies. Quite aside from the showing of continuing need which we have accepted, the need which existed when these restrictions were first adopted refutes any inference of a hidden motive to maintain resale prices. In this state of the record, the unchallenged portion of the Commission's order which prohibits Sandura from entering into any schemes for maintaining resale prices is fully adequate to prevent any future use in enforcing such schemes of distributors who happen to have closed territories.

We deny enforcement of that part of the Commission's order which forbids the maintenance of Sandura's described plan of closed distributor territories.

III. *Scope of the Commission Order.*

Sandura attacks several provisions of the Commission order as unjustified by the unfair competitive practices actually found. Some of these objections are rendered moot by our conclusion that the territorial restrictions employed by Sandura were justified. That conclusion also requires us to strike the prohibition against allocating classes of persons to whom distributors or dealers may sell Sandura products. There was no showing of customer restrictions divorced from the territorial restrictions, so any possible foundation for that portion of the order falls with the prohibition of territorial allocation.

More difficult problems are presented by portions of the order founded on the unchallenged conclusion that Sandura had engaged in unlawful resale price maintenance. Sandura challenges the prohibitions against franchising dealers or distributors for two years after the order takes effect, circulating lists of dealers or distributors among its dealers and distributors, affixing marks which identify individual commercial sized units of its

products, and refusing to sell to dealers or distributors suspected of price deviations in either purchases or sales. We are unable to conclude that, except as hereinafter discussed, any of these prohibitions amount to such an abuse of the Commission's remedial discretion as to call for modification in this Court.

Several recent Supreme Court cases have reaffirmed the remedial latitude allowed the Commission in a wide variety of situations. See FTC v. Henry Broch & Co., 368 U.S. 360, 364, 82 S.Ct. 431, 7 L.Ed.2d 353 (1962); FTC v. Mandel Bros., 359 U.S. 385, 392, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); FTC v. National Lead Co., 352 U.S. 419, 428, 430, 77 S.Ct. 502, 1 L.Ed.2d 438, 445–446 (1957); FTC v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 96 L.Ed. 1081, 1087 (1952); FTC v. Cement Institute, 333 U.S. 683, 726, 68 S.Ct. 793, 92 L.Ed. 1010, 1047–1048 (1948); Jacob Siegel Co. v. FTC, 327 U.S. 608, 611–613, 66 S.Ct. 758, 90 L.Ed. 888, 892–893 (1946). These cases establish that the question on review is whether the Commission chose a remedy "reasonably related" to the violations it has found. As explained by the Court in the Cement Institute case,

"the Commission has a wide discretion generally in the choice of remedies to cope with trade problems entrusted to it by the Commission Act. * * * There is a special reason, however, why courts should not lightly modify the Commission's orders made in efforts to safeguard a competitive economy. Congress when it passed the Trade Commission Act felt that courts needed the assistance of men trained to combat monopolistic practices in the framing of judicial decrees in antitrust litigation. Congress envisioned a commission trained in this type of work by experience in carrying out the functions imposed upon it." 333 U.S. 726, 68 S.Ct. 815–816, 92 L.Ed. 1047–1048.

Of particular relevance to the present problem is the observation in the National Lead Co. case that "decrees often sup-

press a lawful device when it is used to carry out an unlawful purpose." 352 U.S. 430, 77 S.Ct. 509, 1 L.Ed.2d 446.

 Sandura was found to have maintained resale prices through a system of dealer "franchise" agreements not to engage in "unfair competitive practices." Lists of franchised dealers were circulated so dealers and distributors would be sure not to sell to unfranchised dealers. The Commission found that individual identifying marks on commercial sized units went beyond production control requirements and at least enabled Sandura to identify transgressing distributors or dealers. While it may be questionable practice to bar these devices without regard to the purpose for which they may be used, we cannot say the Commission's order was unreasonable in light of these past abuses.

More particular discussion is merited by the prohibition against unilaterally refusing to sell to distributors or dealers for buying or selling Sandura products at any price. Despite the gradual erosion of its principle, see United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the decision in United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919) has never been overruled. It must therefore be assumed that Sandura ordinarily would have the right unilaterally to refuse to sell to any price-cutting distributors or dealers. Where there has been a continued course of unlawful price maintenance by agreement, however, it is within the discretion of the Commission to determine that the only effective way to terminate the effects of the unlawful conduct is by barring an otherwise lawful course of conduct which could have the practical effect of continuing the unlawful conduct unmitigated.

We feel, however, that the interdiction of lawful conduct as a means of preventing Sandura from re-engaging in illegal price-fixing should not be without limitation in time. The Commission limited its proscription of the issuance of franchises or licenses to a period "of two years following the effective date of this order." It gave no reason, however, for not making its prohibitions against other lawful practices as set forth in subsections 3(a), (c), (d), and (e), subject to the same limitation. We believe that competition in the industry would be hurt rather than served by permanently crippling a competitor by the unlimited forbidding of its use of lawful business practices. Extension of the injunction against lawful conduct beyond a time necessary to eliminate its contribution to illegal conduct would, in our view, be unreasonably punitive and not remedial. The mentioned sections of the order will be modified to contain such two year limitation.

To the extent that any provisions of the Commission's order conflict with this opinion, they should be modified.

The cause is remanded to the Commission for such purpose and as so modified the order is directed to be enforced.