DOHERTY, CLIFFORD, STEERS &
SHENFIELD, INC., Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

MERCK & CO., Inc., Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

Nos. 17295, 17296.

United States Court of Appeals
Sixth Circuit.

April 4, 1968.

James H. McGlothlin, Washington, D. C., Charles E. Buffon, Washington, D. C., John M. Stocker, Rahway, N. J., on brief, for Merck.

Philip K. Schwartz, New York City, Davis, Gilbert, Levine & Schwartz, New York City, on brief; Philip K. Schwartz, Paul B. Gibney, Jr., New York City, of counsel, for Doherty, etc.

Miles J. Brown, Federal Trade Commission, Washington, D. C., James McI. Henderson, General Counsel, J. B. Truly, Asst. Gen. Counsel, Frank Gregory, Attorney, Federal Trade Commission, Washington, D. C., on brief, for respondent.

Before O'SULLIVAN, PHILLIPS and CELEBREZZE, Circuit Judges.

PHILLIPS, Circuit Judge.

The Federal Trade Commission held that the manufacturer of Sucrets, a throat lozenge, and its advertising agency disseminated false advertisements in violation of Sections 5 and 12 of the Federal Trade Commission Act.[1] The manufacturer, Merck & Co., and the advertising agency, Doherty, Clifford, Steers & Shenfield, Inc.,[2] have filed petitions to review the cease and desist order issued by the Commission.

We affirm and enforce the final order of the Commission in its entirety.

### 1) The Order Against Merck

Merck manufactures and sells Sucrets and Children's Sucrets. The Commission found that there is no substantial difference between these two products insofar as medical usefulness is concerned. Children's Sucrets have a wild cherry flavor designed to appeal to children.

Merck sponsored television commercials which were created by Doherty. The visual sequence depicted silhouettes of a man's or child's head with a flame in the throat. The flame was shown starting low in the neck and flaring up into the throat. Each commercial showed the word "Sucret" or "Children's Sucret" entering the mouth and going down the throat as the flame flickered and was extinguished. The "Children's Sucret" commercial depicted a "recovered" child,

---

1. These sections of the statute provide in relevant part as follows:

15 U.S.C. § 45(a) (1). "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful."

15 U.S.C. § 45(a) (6). "The Commission is empowered and directed to prevent persons, partnerships, or corporations * * *, from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."

15 U.S.C. § 52. "Dissemination of false advertisements—Unlawfulness

"(a) It shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—

"(1) By United States mails, or in commerce, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, or cosmetics; or

"(2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in commerce of food, drugs, devices, or cosmetics.

."Unfair or deceptive act or practice

"(b) The dissemination or the causing to be disseminated of any false advertisement within the provisions of subsection (a) of this section shall be an unfair or deceptive act or practice in commerce within the meaning of Section 45 of this title. Sept. 26, 1914, c. 311, § 12, as added Mar. 21, 1938, c. 49, § 4, 52 Stat. 114."

2. On December 31, 1964, the Doherty advertising agency was merged with and into Needham, Harper & Steers, Inc. By stipulation the final order was amended to make the merged firm subject to its prohibitions. The advertising agency is referred to as "Doherty" in this opinion. The manufacturer is referred to as "Merck."

who had been in severe pain before taking the lozenge, playing normally after having consumed the lozenge.

Accompanying the visual sequence of the adult's flaming throat was the following oral representation concerning Sucrets:

"When sore throat strikes and brings fiery pain, what do you do for relief? Millions of people depend on Sucrets for relief of minor sore throat pain. Individually foil wrapped, remarkable Sucrets lozenges relieve sore throat pain fast and kill even Staph and Strep germs with a special pain relieving antiseptic, Hexylresorcinol. So, when minor sore throat strikes and brings fiery pain, Sucrets relieve sore throat pain and kill even Staph and Strep germs. Sucrets are fast. Within minutes you can talk, swallow, even smoke in comfort. So, when sore throat strikes, relieve pain fast and kill even Staph and Strep germs."

The following oral representation accompanied the picture of the extinguishment of the flame in the child's throat:

"When your child has a sore throat. * * * It can make you feel helpless. What do you do to relieve the pain? If he's too young to gargle * * * and you want something more effective than candy cough drops * * * try new Children's Sucrets * * * specially flavored for youngsters * * * by the makers of regular Sucrets. Children's Sucrets contain hexylresorcinol—the *gentle* antiseptic. And, Children's Sucrets relieve pain fast and help fight infection. These lozenges are made especially for children. Look: When minor sore throat strikes and brings burning pain * * * Children's Sucrets gently * * * safely * * * take care of the pain * * * and help fight infection. In no time at all * * * your child's like himself again. So next time your child has sore throat * * * if he's too young to gargle * * * and you want something more effective than candy cough drops * * * Relieve

pain fast * * * help fight infection. Get new Children's Sucrets!"

The Commission found these commercials to be misleading in material respects and held that they constituted false advertisements within the meaning of the Federal Trade Commission Act. The Commission adopted in substantial part the findings of fact of its hearing examiner, but made certain modifications. Excerpts from these findings, as modified, are set forth as Appendix A.

We hold that these findings of fact are supported by substantial evidence on the record considered as a whole and that the inferences drawn by the Commission are reasonable and permissible.

The final order of the Commission, which is somewhat broader than the order proposed in the initial decision of the hearing examiner, contains the following directions against Merck:

"It is ORDERED that respondent Merck & Co., Inc., a corporation trading as Quinton Company or under any other name, and its officers, agents, representatives, and employees, directly or through any corporate or other device, in connection with the offering for sale, sale or distribution of throat lozenges or any similar preparation, do forthwith cease and desist from, directly or indirectly:

"1. Disseminating, or causing to be disseminated, by means of the United States mails or by any means in commerce, as 'commerce' is defined in the Federal Trade Commission Act, any advertisement which represents directly or by implication that 'Sucrets' or 'Children's Sucrets', or any other preparation of similar chemical composition or properties, by virtue of their hexylresorcinol content, or otherwise:

"(a) Will reach, kill or have any effect upon germs contributing to an existing throat infection, or otherwise that they are effective in the treatment of throat infection.

"(b) Will provide relief of the pain of sore throat in excess of temporary relief of minor pain.

"2. Disseminating, or causing to be disseminated, by the United States mails or by any means in commerce, as 'commerce' is defined in the Federal Trade Commission Act, any advertisement which misrepresents directly or by implication the efficacy or therapeutic value of any throat lozenge or similar preparation.

"3. Disseminating, or causing to be disseminated, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase of any such preparation, in commerce, as 'commerce' is defined in the Federal Trade Commission Act, any advertisement which contains any of the representations prohibited by Paragraphs 1 and 2 hereof."

Merck attacks this order as being broader than warranted by the facts and urges that in no event should the Commission's order be broader than that recommended by the hearing examiner. The order proposed by the hearing examiner sought only to prohibit Merck from representing that its throat lozenges "(a) [w]ill kill or render ineffectual germs in the throat tissues that are contributing to an existing throat infection; (b) [w]ill afford permanent or long lasting relief of sore throat pain."

Merck asks the Court to substitute the examiner's order for that of the Commission. As said by the Supreme Court of another litigant: "Respondents made no appeal here from some of the findings as to their guilt. Having lost the battle on the facts, they hope to win the war on the type of decree." Federal Trade Commission v. National Lead Co., 352 U.S. 419, 429, 77 S.Ct. 502, 509, 1 L.Ed.2d 438.

■ The rule is well established that the Commission's findings of fact in the area of trade and commerce are entitled to be given great weight. The Commission is permitted to draw reasonable inferences from the evidence and its findings are conclusive if supported by substantial evidence. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; J. B. Williams Co. v. Federal Trade Commission, 381 F.2d 884 (6th Cir.); Libbey-Owens-Ford Glass Co. v. Federal Trade Commission, 352 F.2d 415 (6th Cir.).

■ Reviewing courts are admonished that in cases involving allegedly deceptive advertising the Commission's judgment is to be accorded especial deference. Federal Trade Commission v. Colgate-Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 13 L.Ed.2d 904; Libbey-Owens-Ford Glass Co. v. Federal Trade Commission, supra, 352 F.2d 415, 417 (6th Cir.).

■ It is the function of the Commission to determine "[t]he meaning of advertisements or other respresentations to the public, and their tendency or capacity to mislead or deceive, * * *" Carter Products, Inc. v. Federal Trade Commission, 323 F.2d 523, 528 (5th Cir.). This Court has said that "[t]he Commission is not bound to the literal meaning of the words, nor must the Commission take a random sample to determine the meaning and impact of the advertisements." J. B. Williams Co. v. Federal Trade Commission, supra, 381 F.2d 884, 890 (6th Cir.). The fact that an advertiser made its representations in good or bad faith is not determinative of whether such statements are deceptive and misleading. Koch v. Federal Trade Commission, 206 F.2d 311 (6th Cir.).

■ The reviewing court's limited scope of inquiry in false advertising cases is particularly appropriate when dealing with representations of the effectiveness of proprietary drugs. Substantial deference to the Commission's findings is required not only by the agency's expertise in interpreting advertisements but also by the great interest in protecting and informing the self-medicating consumer. "Fraudulent misrepresentations of the curative value of nostrums not only operate to defraud purchasers but are a distinct menace to the public health. There are none so credulous as sufferers

from disease." [3] In evaluating the tendency of advertising to deceive, the Commission is bound to protect the public in general, the unsuspecting as well as the skeptical. Exposition Press, Inc. v. Federal Trade Commission, 295 F.2d 869, 872 (2d Cir.), cert. denied, 370 U.S. 917, 82 S.Ct. 1554, 8 L.Ed.2d 497.

Both the hearing examiner and the Commission found that Sucrets can kill some bacteria in the saliva in the mouth and throat. Yet, they were in agreement that notwithstanding the ability of this product to kill some germs on contact, Merck's advertising claims were highly deceptive, because Sucrets are not of any substantial medical benefit in curing an existing sore throat. Thus, the ability to kill germs on the surface of the throat lacks real significance.

■ The Commission was well supported in its determination that the implication of the advertising was that Sucrets will cure existing sore throats, including "strep" throat.

The evidence supports the following conclusions by the Commission: (1) that, regardless of whether Sucrets can kill germs on the surface of the throat, they will not kill such bacteria in a manner that is medically significant; (2) that Sucrets cannot effectively attack viruses which cause a viral sore throat; and (3) that Sucrets do not cure or help to cure an existing throat infection.

Contrary to the obvious implications of the misleading advertisement that Sucrets will "kill even Staph and Strep germs," the evidence supports the Commission's conclusion that Sucrets will not cure "strep" throat. Streptoccal throat infections are regarded as a major illness because of the serious consequences that may ensue in the absence of effective treatment. Evidence was introduced showing that a primary hazard of a child's "strep" throat is the subsequent development of acute rheumatic fever or acute nephritis.

■ In *Colgate* the Supreme Court reiterated that the Commission has wide discretion in remedying unfair or misleading commercial practices:

"It has been repeatedly held that the Commission has wide discretion in determining the type of order that is necessary to cope with the unfair practices found, e. g., Jacob Siegel Co. v. Federal Trade Comm'n, 327 U.S. 608, 611, 66 S.Ct. 758, 759, 90 L.Ed. 888, and that Congress has placed the primary responsibility for fashioning orders upon the Commission, Federal Trade Comm'n v. National Lead Co., 352 U.S. 419, 429, 77 S.Ct. 502, 509, 1 L.Ed.2d 438. For these reasons the courts should not 'lightly modify' the Commission's orders. Federal Trade Comm'n v. Cement Institute, 333 U.S. 683, 726, 68 S.Ct. 793, 815, 92 L.Ed. 1010." 380 U.S. at 392, 85 S.Ct. at 1046.

■ Where the Commission's order is attacked as overly broad, the question on review is whether the Commission chose a remedy "reasonably related" to the violations which it found. Sandura Co. v. Federal Trade Commission, 339 F.2d 847, 860 (6th Cir.). We hold that the Commission's order is reasonably related to Merck's misleading representations of both the therapeutic efficacy of Sucrets as well as Sucrets' capacity to relieve pain.

■ While the manufacturer complains of the order's breadth, it is noteworthy that the cease and desist order is confined to misrepresentations concerning throat lozenges or similar preparations. An order of the Federal Trade Commission must be sufficient in its terms to prevent harmful and misleading practices in the future. Only the least sophisticated offender would be deterred by an order limited to the precise illegal practice as it existed in the past. "If the Commission is to attain the objectives Congress envisioned, it cannot be requir-

---

3. Belmont Laboratories, Inc. v. Federal Trade Commission, 103 F.2d 538, 539 (3rd Cir.), quoting from President Taft,

Message to Congress June 21, 1911, see Cong.Rec., Part 12, p. 675.

ed to confine its roadblock to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity." Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081.

 Merck further contends that since its use of the "flame in throat" commercial was discontinued before the complaint was filed, the order should be set aside or modified. "Abandonment of the illegal conduct does not render the controversy moot." Carter Products, Inc. v. Federal Trade Commission, supra, 323 F.2d 523, 531 (5th Cir.).

In short, we hold that the Commission chose a remedy as to Merck which is reasonably related to the violations it found. Sandura Co. v. Federal Trade Commission, supra, 339 F.2d 847, 860 (6th Cir.). We hold that the Commission did not abuse its discretion in the fashioning of its cease and desist order against Merck.

### 2) The Order Against the Advertising Agency

The final order of the Commission contains the following provisions directed against Doherty, Merck's advertising agency:

"It Is Further Ordered that respondent Doherty, Clifford, Steers & Shenfield, Inc., a corporation, and its officers, agents, representatives, and employees, directly or through any corporate or other device, in connection with the offering for sale, sale or distribution of throat lozenges or any similar preparation, do forthwith cease and desist from, directly or indirectly:

"1. Disseminating, or causing to be disseminated, by means of the United States mails or by any means in commerce, as 'commerce' is defined in the Federal Trade Commis-

sion Act, any advertisement which represents directly or by implication that 'Sucrets' or 'Children's Sucrets,' or any other preparation of similar chemical composition or properties, by virtue of their hexylresorcinol content, or otherwise:

"(a) Will reach, kill or have any effect upon germs contributing to an existing throat infection, or otherwise that they are effective in the treatment of throat infection.

"(b) Will provide relief of the pain of sore throat in excess of temporary relief of minor pain.

"2. Disseminating, or causing to be disseminated, by the United States mails or by any means in commerce, as 'commerce' is defined in the Federal Trade Commission Act, any advertisement which misrepresents directly or by implication the efficacy or therapeutic value of any throat lozenge or similar preparation: provided, however, that it shall be a defense hereunder that respondent neither knew nor had reason to know of the falsity or deceptive capacity of such advertisement.

"3. Disseminating, or causing to be disseminated, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase of any such preparation, in commerce, as 'commerce' is defined in the Federal Trade Commission Act, any advertisement which contains any of the representation prohibited by Paragraphs 1 and 2 hereof." (Footnotes omitted.)

The Commission held that the advertising agency was an active participant in the preparation of the advertisements and that the agency knew or had reason to know that Merck's claims were false or deceptive.[4]

4. In its opinion the Commission said:
"We agree with the conclusion of the hearing examiner that the agency should be held but not solely because it was a mere 'participant in the preparation of the advertising.' We believe that the record in this case establishes that the agency was at least equally responsible with its principal for the deception found to be implicit in the advertising under

Doherty urges that it acted only as agent for its client, relying in good faith on the information furnished by Merck. Doherty asserts that having used every available source to assure itself of the accuracy of Merck's claims, there was nothing else the advertising agency could have done. In substance, Doherty contends that there is no substantial evidence from which the Commission could have found that the agency knew or should have known that Merck's claims were false or deceptive. For these reasons Doherty seeks to have the Commission's order set aside and the complaint dismissed as to the agency.

■■■■■ The proper criterion in deciding in a case of this kind as to whether a cease and desist order should issue against the advertising agency is "the extent to which the advertising agency actually participated in the deception. This is essentially a problem of fact for

the Commission." In order to be held to be a participant in such deception, the agency must know or have reason to know of the falsity of the advertising. Carter Products, Inc. v. F. T. C., supra, 323 F.2d 523, 534 (5th Cir.).

The commission held that among the obligations of Doherty as an advertising agency under its agreement with Merck, Doherty was to "offer general marketing consultation for both new and existing products," "formulate advertising Plans" and "prepare layouts and copy for advertisements;" that Doherty's function was to "originate advertising ideas;" that "the advertising at issue, therefore, is the product of both respondents jointly"; that the advertising agency "developed and put into final form the commercials involved in this proceeding"; and that "it is the final form of these commercials from which the falsity of the advertising may reasonably be imputed."

consideration. Moreover, we believe that the agency should have been aware of the deceptive capacity of such advertising. Although the agency contends, in this connection, that it relied on information furnished by Merck, the deception found to exist stems not from the falsity of this information but from the use made of it by the agency. The advertising was based on two pieces of information, i.e., laboratory tests established that Sucrets and Children's Sucrets by virtue of their hexylresorcinol content would under certain conditions kill germs, including staphylococcal and streptococcal germs, on contact and that they would relieve the pain of minor sore throat. As used by the agency, these facts became at best half-truths and exaggerations. We refer particularly to the repeated use of the unqualified claims that the products 'kill even staph and strep germs' and 'help fight infection' in conjunction with the portrayal of a throat engulfed in flame and the prompt recovery of the user. A false impression can be made by words and sentences which are literally and technically true but framed in such a setting as to mislead or deceive, Bockenstette v. F. T. C., 134 F.2d 369 (10th Cir. 1943), and as one writer has pointed out 'The skillful advertiser can mislead the consumer without misstating a single fact. The shrewd use of exaggeration, innuendo, ambiguity and half-truth is

more efficacious from the advertiser's standpoint than factual assertions.'

"Nothing in the information supplied by Merck indicated that Sucrets or Children's Sucrets would have any effect on the course of either a viral or bacterial infection of the throat. Nor was there anything to indicate that these products would promptly eliminate severe pain, such as that symbolized by fire. To the contrary, the agency knew that the products were recommended only for the relief of minor sore throat pain, mouth and throat irritations. Despite this knowledge, it developed advertising, which by the use of 'exaggeration, innuendo, ambiguity and half-truth' conveyed the false impression that the products would cure or help cure existing throat infections and would be effective in relieving severe pain of sore throat. As found by the examiner, the falsity of such advertising should have been apparent to its creator.

"Nor is it a defense to the agency that the advertising was approved by Merck's legal and medical departments. The agency, more so than its principal, should have known whether the advertisements had the capacity to mislead or deceive the public. This is an area in which the agency has expertise. Its responsibility for creating deceptive advertising cannot be shifted to the principal who is liable in any event."

██ We hold that the record in this case demonstrates that the advertising agency participated actively in the deception; Carter Products, Inc. v. F. T. C., supra, 323 F.2d 513, 534 (5th Cir.); and the Commission's findings of fact to this effect are supported by substantial evidence. .

To be aware of the true extent of the therapeutic qualities of Sucrets and Children's Sucrets, the advertising agency needed to do nothing more than to read the packaging labels and instructions for use, which are set forth as Appendix B to this opinion. The advertising prepared by Doherty went far beyond the more modest claim appearing on the labels and instructions.

The protestations of innocence on the part of the advertising agency are refuted convincingly by a document in the record described as "Proposed 1962 Marketing Plan Sucrets Antiseptic Lozenges" prepared by Doherty. This document outlines an ambitious advertising program aimed at selling Sucrets directly to the "self-medicating" market, described as "the middle-lower socio-economic group," and designed to encourage mothers to buy Children's Sucrets for their children. In Appendix C to this opinion appear selected quotations demonstrating the affirmative role of the advertising agency in promoting a program to create in the minds of the "self-medicating" consumer the impression that Sucrets will kill germs, cure sore throat, including "strep" throat, and alleviate "fiery" throat pain.

We find substantial evidence in the record to support the Commission's conclusion that the advertising agency knew or should have known the falsity of these claims.

Doherty challenges paragraph two of the Commission's order directing that it cease and desist from disseminating any advertisement which misrepresents directly or by implication the efficacy or therapeutic value of any throat lozenge or similar preparation. We find that the advertising agency is protected adequately by the closing proviso of this paragraph: "provided, however, that it shall be a defense hereunder that respondent neither knew or had reason to know of the falsity or deceptive capacity of such advertisement."

The order of the Commission is affirmed and enforced.

## APPENDIX A

### EXCERPTS FROM COMMISSION'S FINDINGS OF FACT

"21. Through the use of said advertisements, respondents have represented, directly and by implication, that 'Sucrets' and 'Children's Sucrets', by virtue of their hexylresorcinol content, will unqualifiedly reach, kill, or render ineffectual, germs, including streptococci and staphylococci in the throat tissues, that are contributing to an existing throat infection, and that said products are effective in relieving severe sore throat pain.

"22. Hexylresorcinol is the principal active ingredient in both products. Each lozenge has 2.4 mgs. in a 2.5 gram tablet. The concentration is thus approximately one part hexylresorcinol to 1,000 parts of other ingredients. Experiments performed at the Merck Institute of Therapeutic Research established that the concentration of 'Sucrets' ingredients in saliva during normal use is between 5 and 20 percent, with the average being close to 10 percent. The concentration of hexylresorcinol in the saliva during normal use is, therefore, approximately one part hexylresorcinol to 10,000 parts other material.

"23. Hexylresorcinol in 1 to 10,000 concentration is highly bactericidal against organisms known to be pathogenic, including betahemolytic streptococci and staphylococcus aureus, and has antibacterial effects on other bacteria.

"24. Other ingredients in the products, such as menthol, anise oil and methyl salicylate, also have antibacterial effects but not as extensively as the hexylresorcinol.

"25. Consistent with the experiments performed with hexylresorcinol, and experience with other of the ingredients

found in the products, laboratory tests performed at the Merck Institute of Therapeutic Research using concentrations encountered in use established that on contact the products will kill known pathogenic organisms, including beta-hemolytic streptococci aureus, and have antibacterial effects upon other bacteria. Experiments performed by the Commission's witness, Dr. Ortenzio, support the same conclusion. The ability of the products to kill germs is confirmed by anti-bacterial tests performed on each lot of 'Sucrets' or 'Children's Sucrets' before it is released for sale.

"26. Human saliva normally contains .2% organic matter. The ability of hexylresorcinol and the products to kill germs is not affected by the presence of organic matter in more than twice the normal concentration.

"27. The products retain their anti-bacterial power when dissolved in saliva. This power exists even when abnormally large numbers of pathogenic organisms are used.

"28. Hexylresorcinol and the products retain their antibacterial activity when in contact with living animal and human tissue. This fact has been verified on the peritoneal lining of living rabbits and guinea pigs, and in the peritoneal and oral cavities of human beings.

"29. Although 'Sucrets' and 'Children's Sucrets' will, by virtue of their hexylresorcinol content, kill germs, including staphylococci and streptococci, on contact therewith, they will not normally reach, kill or render ineffectual, germs, including streptococci and staphylococci in the throat tissues, that are contributing to an existing throat infection.

"30. Streptococcal and staphylococcal infections of the throat may be precursors of infections of the heart, kidney, blood, bones and other structures, and the failure to institute promptly adequate treatment of streptococcal and staphylcoccal throat infections may seriously imperil health. A special hazard of inadequate treatment of streptococcal sore throat is the subsequent development in certain persons, particularly children, of acute rheumatic fever or acute nephritis.

"31. 'Sucrets' and 'Children's Sucrets' have no beneficial effect on severe pain of sore throat, nor will they provide relief of the pain of sore throat in excess of temporary relief of minor pain.

"32. The aforesaid advertisements were and are misleading in material respects and constituted, and now constitute, 'false advertisements' as that term is defined in the Federal Trade Commission Act."

## APPENDIX B

## MANUFACTURER'S DIRECTIONS FOR USE OF SUCRETS AND CHILDREN'S SUCRETS

The designations used by respondent Merck & Co., Inc., for said preparations thereof and directions for use are as follows:

A. *Designation*: "Sucrets" throat lozenges.

*Directions*: "Use SUCRETS for minor sore throat and mouth ir-ritations and smoker's throat. For best results let SUCRETS dissolve slowly—do not chew. SUCRETS bathe irritated tissue with hexylresorcinol, the antiseptic that relieves pain fast as it kills germs on contact.

Note: Persistent sore throat or sore throat accompanied by high fever, headache, nausea or vomiting usually indicates a severe infection and may be serious. Consult a physician promptly if sore throat persists more than 2 days. Do not administer to children under 3 years of age unless directed by physician. Keep all medications out of the reach of children."

B. *Designation*: "Children's Sucrets" throat lozenges.

*FORMULA*: Each lozenge contains 2.4 mg. hexylresorcinol in a cherry flavored glucose-sucrose hard candy base.

*Directions*: "Give Children's Antiseptic 'Sucrets' for minor sore throat and mouth irritation. For best results tell child to let 'Sucrets' dissolve slowly without chewing. 'Sucrets' bathe irritated tissues with Hexylresorcinol, the antiseptic that relieves pain fast as it kills germs on contact. These 'Sucrets' contain a special cherry flavor which children love.

NOTE: Persistent sore throat or sore throat accompanied by high fever, headache, nausea or vomiting usually indicates a severe infection and may be serious. Consult a physician promptly if sore throat persists more than 2 days. Do not administer to children under 3 years of age unless directed by a physician. Keep all medications out of the reach of children."

## APPENDIX C

EXTRACTS FROM "PROPOSED 1962 MARKETING PLAN SUCRETS ANTISEPTIC LOZENGES," PREPARED BY DOHERTY, CLIFFORD, STEERS & SHENFIELD ADVERTISING AGENCY

"MERCK & CO., INC.'s entry into the proprietary drug market with SUCRETS—a well-established OTC ethical—is a natural extension of its current activity.

"But, natural as it may be, the marketing problems and opportunities facing proprietaries are different than those facing pharmaceutical specialties and OTC ethicals. *The significance of these differences should be placed in perspective.*

"As a preface to the SUCRETS Marketing Plan which will recommend how we propose to transfer SUCRETS—as the lead item for a new MERCK division—into the propriety market, we would like to discuss briefly these differences.

"More specifically, this preface reviews

"1. The difference between OTC ethical and proprietary drugs.

"2. The self-medicating market.

"3. The product characteristics which we believe are important in proprietary medicines.

"4. The marketing plan itself—its purpose, its organization, and its scope.

\* \* \* \* \* \*

"To date, MERCK has focused its development, production, and marketing attention against pharmaceutical specialties—with OTC ethicals as natural adjuncts to this effort. By definition, the ethical OTC products differ from proprietaries in the way that they are marketed. Ethical OTC brands use marketing tools that are designed to gain cooperation and brand recommendation from physicians and pharmacists. Proprietaries, by definition, use marketing tools —led by advertising—aimed directly at the consumer to create consumer brand demand.

\* \* \* \* \* \*

"[I]n proprietary marketing the focal point is neither the physician nor the druggist—it is the consumer. And the consumer is neither well-informed nor well-trained. They do not understand the reasons for pharmaceutical excellence.

\* \* \* \* \* \*

"Products heavily promoted to the consumer must be acceptable to the self-medicating market. And, this market is different than the segment of the market which uses non-prescription medicines on the basis of either physician or druggist recommendation.

\* \* \* \* \* \*

*"The Self-Medicating Market*

"From our experience, we have learned that there are many characteristics that are almost universal to the self-medicating market.

"1. *It is a market with high brand loyalties.*

"Quick success is frequently difficult. Unless the product repre-

sents a major breakthrough which promised relief never before offered by proprietary items, it is difficult to switch a customer.

As you well know, the medical profession readily accepts important product improvements because they are influenced rationally by product superiority. They have a responsibility to their patients to provide the best.

"The consumer—due to lack of training and knowledge—cannot share this responsibility. Use and habit create their standard of best.

" * * * Consumers' loyalties are difficult to break down since the habit has been created over many, many years with constant promotional pressure.

"2. *The loyalties in the self-medicating market have been created directly in the consumer's mind by strong, continuous advertising support.*

"A new product, therefore, must build consumer demand and must obviously also win the battle at the retail shelf.

"3. *The self-medicating market is most loyal to products which offer demonstrable relief.*

"Consumers, to be loyal, must be able to measure and readily understand product effect and superiority.

"4. *In those categories within the proprietary market in which the self-medicating consumer has not really been satisfied with the relief which has been offered, brand loyalties are lower and new products have a greater opportunity for quick success.*

"A product classification as a case in point is the cold remedy market. If a product can deliver noticeable relief in this market and if it is presented forcefully as superior to existing products, it can broaden its volume base quickly.

"5. *The self-medicating market primarily is a distaff market.*

"Promotions should be aimed at influencing the women. If possible, products should not only assure her of protection of her own health, but also protection of her entire family's health.

"6. *The self-medicating market is the middle-lower socio-economic group.*

"They can most easily be influenced if they are given a comparative point of reference from their past experience. It is difficult to sell a 'preventive' to these people —they have a problem and need relief. Except at the moment of need, they are difficult to reach by the printed message.

"Proprietaries are relatively low-interest products. As an example, they are much less important to the consumer than pharmaceutical specialties and OTC ethicals are to the physician or the druggist.

"We must all realize that proprietary medicines must appeal to an entirely different segment of our market than the segment which uses the physician and pharmacist for their medical advice. They also have a different need. Self-medicating people have both a psychological and real need for relief. They respond to persuasive selling, but the advantages must be clearly and concisely stated in terms of relief to them—and these advantages, ideally, must be compared to points of references in their own life—the 'gold standard' therapy or relief of their experience.

\* \* \* \* \* \*

"Consumers of proprietaries (the self-medicating group) have different motives and attitudes toward drug products than consumers of OTC ethical drug products. The self-medicator depends heavily upon advertising for product advice rather than upon the counsel of the druggist or physician.

"Unaided by professional advice, the consumer's decision to medicate himself fills both psychological and physical needs. The brand selection decision, while it has emotional overtones, is a response to rational selling arguments.

\* \* \* \* \* \*

"*Throat lozenges cannot become mass volume products without tapping the mass market—the self-medicating market.*

"*The self-medicating market cannot be reached effectively without mass consumer promotion.*

"Self-medicating consumers depend upon advertising for product information, not upon the druggist or the physician. These consumers must be told through advertising:

"1– the potential seriousness of throat ailments, and

"2– the reasons for lozenge superiority.

"*Sore throat is a common and bothersome problem to cold sufferers.*

"A 'sore throat' is a real disease to consumers. It exists—the potential seriousness should be exploitable.

"SUCRETS offers demonstrable relief for throat irritations. We believe that it is therefore *important that SUCRETS be positioned in the marketplace as a remedy for throat irritations.*

\* \* \* \* \* \*

"All developments in the drug market indicate that OTC ethicals cannot expect that dramatic new attention will be devoted to their products in the years ahead. The consumer and the physician today have so many alternative choices available that direct support for an OTC ethical is difficult to achieve among either group.

\* \* \* \* \* \*

"[T]he primary appeal is to the self-medicating family unit. The Mother is offered the opportunity to guard the health of her child. Television is used as the primary medium to break through the barrier of consumer indifference and preoccupation.

\* \* \* \* \* \*

"The respiratory ailment market is expansible and is expanding.

"New marketing techniques and products which offer effective demonstrable relief can lead this expansion and build stronger franchises.

"SUCRETS can be positioned to compete and draw business from any different types of products used as treatments for sore-throat-irritations.

\* \* \* \* \* \*

"SUCRETS product qualities have never been fully exposed to the mass self-medicating market nor as a product suitable for children.

"Proprietaries depend upon advertising to generate volume. SUCRETS is no exception. Advertising must play a major part in broadening the market for SUCRETS.

"PROPOSED SUCRETS MARKETING STRATEGY

\* \* \* \* \* \*

"As a 'sore-throat specialty' \* \* \*."

"Appealing to the self-medicating family unit."

"This family unit believes in self-medication. This group represents the largest additional potential for SUCRETS.

"Advertising can dramatize the real and potential danger in a sore throat and the importance of effective treatment. The self-medicating family unit protects its health through the use of proprietaries. It can only be reached by mass consumer promotion.

\* \* \* \* \* \*

"SUCRETS should be marketed to influence the public without the intermediary of physician and/or druggist endorsement.

\* \* \* \* \* \*

"The advertising should dramatize the potential seriousness of the sore throat and related irritations and indicate the importance of treating the symptoms with a fast-acting, effective medicine.

"The advertising should present SUCRETS as *the* medicine for sore-throat relief with unique efficacy—implied or

indicated—due to the action of hexyl-resorcinol and the form of the product.

\* \* \* \* \* \*

"The advertising should build upon the existing attitudes toward SUCRETS, presenting it as a quasi-ethical medicinal specialty."