**Margaret RAMSON, Plaintiff,**

**v.**

**David LAYNE, et al., Defendants.**

**No. 86 C 10239.**

United States District Court,
N.D. Illinois, E.D.

Aug. 25, 1987.

Sheryl E. Healy, Chicago, Ill., for plaintiff.

Daniel R. Formeller, Jacqueline A. Criswell, Deborah L. Ingraham, John E. Munger of Tressler, Soderstrom, Maloney & Priess, Chicago, Ill., for Bridges.

Ronald L. Futterman, Hartunian, Futterman & Howard, Chtd., Chicago, Ill., for Yaffee.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Margaret G. Ramson ("Ramson") invested $36,000 with A.J. Obie & Associates ("Obie") for the purchase of a mortgage note from Diamond Mortgage Corporation ("Diamond"). Ramson received neither a mortgage note nor the return of her money and now both Obie and Diamond are in bankruptcy. Ramson therefore sues a number of individual defendants:

1. persons who had been officers, directors or shareholders of the two corporations—Leslie Lupovich, Walter Pytlak and Barton Greenberg[1]—all under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968 and the Illinois Consumer Fraud and Deceptive Practices Act (the "Illinois Act"), Ill.Rev.Stat. ch. 121½, ¶¶ 261-313;[2] and

2. actors Lloyd Bridges ("Bridges") and George Hamilton ("Hamilton") and advertising agency Yaffe & Company ("Yaffe") under the Illinois Act, based on their involvements in promoting Obie and Diamond.

Now each of Bridges and Yaffe has moved for dismissal under Fed.R.Civ.P. ("Rule") 12(b)(6). Bridges urges dismissal is warranted for two reasons:

1. Ramson's Complaint fails to state a claim under the Illinois Act because (a) Bridges was not an "endorser" for Obie or Diamond and (b) even if he were, the Illinois Act does not provide a right of action against an endorser.

2. Additionally the Complaint fails to satisfy Rule 9(b)'s requirement that averments of fraud be stated with particularity.

Yaffe seeks dismissal only on the second ground. For the reasons stated in this memorandum opinion and order, the first contention is rejected but the second succeeds.

### Facts[3]

Obie is an investment firm that shared common ownership and management with Diamond (¶ 86). Obie solicited individuals to invest in "First Mortgage Notes" secured by first mortgages on residential real property. Diamond obtained those mortgage notes to be supplied to Obie investors by making loans with the investors' funds (¶¶ 87-91 and 156; Ex. F).

Obie and Diamond used a single unified advertising plan to promote investments in both corporations (¶ 92). To that end they retained:

1. Yaffe to devise a promotional program comprising television, radio and print advertisements (¶¶ 154-57); and

2. Bridges and Hamilton to endorse Obie and Diamond and give testimonials through the same three advertising media (¶ 93).

Yaffe "produced and/or composed and/or distributed" Obie and Diamond advertisements (¶ 158), including two print advertisements attached to the Complaint (¶ 159; Exs. H and I). Yaffe's television advertisements featured Bridges and Hamilton (¶ 168). For his part, Bridges "appeared in numerous television and print advertisements in which he solicited investments for ... Obie [by] advising [viewers] of the high yields and low risks" of such investments (¶ 105). Hamilton's advertisements are not described, except to say they

---

1. Ramson originally also named Diamond's President (and director) David Layne as a defendant, but her most recently filed Third Amended Complaint (the "Complaint") does not do so. Since the Complaint was filed Ramson has also dismissed out Jetta Greenberg, Executrix of the Estate of Sheldon Greenberg (who had also been a corporate principal).

2. Further citations to the Illinois Act will take the form "Illinois Act § ——."

3. Rule 12(b)(6) principles require this Court to accept as true all well-pleaded factual allegations, drawing all reasonable inferences in plaintiffs' favor. *Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir.1987) (per curiam). All citations to the Complaint will simply take the form "¶ ——" or "Ex. ——." Ramson's memoranda will be referred to as "Ramson/B Mem." (responding to Bridges' motion) and "Ramson/Y Mem." (responding to Yaffe's motion).

"were designed to assist OBIE in soliciting investments" (¶ 96).

Hamilton, Bridges and Yaffe committed false, unfair, fraudulent and deceptive practices in promoting Diamond and Obie (¶¶ 107 and 170 repeat these identical allegations, quoted in full):

(a) By misrepresenting the risks and returns associated with both OBIE investments and DIAMOND mortgages.

(b) By misrepresenting the integrity and reliability of A.J. OBIE and/or DIAMOND and their affiliates.

(c) In misrepresenting investment in A.J. OBIE as a conservative investment without risk.

(d) In misrepresenting that DIAMOND was a corporation "you could count on."

(e) In misrepresenting that OBIE investments would be backed by mortgages on real estate.

(f) If endorsing a fraudulent scheme whereby non-existent mortgages were sold to the investors, including Plaintiff herein.

(g) In misrepresenting, through omission, or failure to disclose, the following material facts concerning A.J. OBIE and DIAMOND.

(i) That said Illinois corporations were affiliates of similar, if not identical, Michigan corporations owned by the Greenbergs and managed by the same group of people.

(ii) That said Michigan affiliates had had several regulatory problems in the State of Michigan.

(iii) That in 1979 a suit was filed by the State of Michigan to revoke the charter of DIAMOND of Michigan, charging DIAMOND had violated Michigan's usury and consumer protection statutes.

(iv) That in 1981, the Corporation and Securities Bureau of Michigan required Diamond of Michigan to offer to return seven million dollars plus interest to Michigan residents who had invested in A.J. Obie and Associates of Michigan.

(v) That in 1982 the securities license of A.J. Obie of Michigan was revoked following fraud charges.

(vi) That Arnold J. Obie, the managing executive of A.J. Obie in Michigan was banned by Michigan securities regulators from holding a supervisory job with a securities firm and forced to sell his ownership interest in that firm.

(vii) In failing to disclose that investors' funds were being used for unauthorized purposes, including, but not limited to, the comingling of investors' funds, the pooling of mortgage interests, the payment of investors' funds to certain individual defendants and for other unauthorized disbursements.

(h) In failing to properly investigate OBIE or DIAMOND prior to promoting said companies with untrue statements.

(i) In failing to comply with the FTC guidelines concerning testimonials and endorsements set out in 16 CFR Ch. 1, Sec. 255.

Ramson, in reliance on:

1. testimonial advertisements featuring Hamilton and Bridges (¶ 109),

2. television, radio and print advertisements prepared by Yaffe (¶ 172) and

3. representations made by account executive William Marks ("Marks") during a September 17, 1985 visit with Ramson in her home (¶ 35),

invested $36,000 with Obie for the purchase of a mortgage note from Diamond (Ex. B). But Ramson's money was never "matched with" a Diamond mortgage, nor was the $36,000 returned to her (¶ 39). On December 31, 1986 Ramson filed this action.

### Illinois Act

Ramson charges Bridges (and the other defendants) violated Illinois Act § 262, which provides in part (footnotes omitted):

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, omission of any material fact, with intent that others rely upon the concealment, sup-

pression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

Sometimes the Illinois Act is described as a "little FTC Act" because Illinois Act § 262 goes on to say:

In construing this section consideration shall be given to the interpretations of the Federal Trade Commission ["FTC"] and the federal courts relating to Section 5(a) of the Federal Trade Commission Act [the "Federal Act"].[4]

Unlike the Federal Act, however, the Illinois Act affords consumers a private right of action (Illinois Act § 270a(a)) (footnote omitted):

Any person who suffers damage as a result of a violation of Section 2 through 20 of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual damages or any other relief which the court deems proper.[5]

### *Bridges' Liability as an "Endorser"*

■ Bridges urges the Complaint fails to state a claim under the Illinois Act because it seeks to impose liability on him as an "endorser" of Obie and Diamond and their wares. Bridges contends he was not an endorser and, even if he were, the Illinois Act does not provide a right of action against endorsers. Neither contention has merit.

### 1. *Bridges as an "Endorser"*

FTC's Guides Concerning Use of Endorsements and Testimonials in Advertising (the "Guidelines")[6] define "endorser" and "endorsement" this way (Reg. § 255.-0(b) (emphasis added)):

For purposes of this part, an "endorsement" means any *advertising message* (including verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization) *which* message *consumers are likely to believe reflects the opinions, beliefs, findings, or experience of a party other than the sponsoring advertiser.* The party whose opinions, beliefs, findings, or experience the message appears to reflect will be called the endorser and may be an individual, group or institution.

In contrast a "spokesperson" (the term this opinion will employ) is one (Reg. § 255.0 Example 3):

who is not familiar to consumers except as a spokesman for the ... company [and] purports to speak, not on the basis of his own opinions, but rather in the place of and on behalf of the ... company.

Bridges Mem. 10–11 contends Bridges was a spokesperson and not an endorser:

The Complaint does not allege that representations allegedly made by Bridges contain language informing consumers that such representations were the personal opinions or beliefs held by Bridges or were based on Bridges' experiences with the use of the product.

\* \* \* \* \* \*

Again, Bridges was employed merely as a spokesperson to speak in place of, and on behalf of the advertiser, Obie. He is perceived by the public to be merely an actor with no expertise in the highly spe-

---

**4.** [Footnote by this Court] Federal Act § 5(a) (15 U.S.C. § 45(a)) says:

Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

**5.** [Footnote by this Court] "Person" is in turn defined in Illinois Act § 261(c) as:

any natural person or his legal representative, partnership, corporation (domestic and for-

eign), company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof[.]

**6.** Those Guidelines are codified at 16 C.F.R. § 255.0–255.5, cited "Reg. § ——."

cialized field of investments and mortgage financing.

That last sentence really highlights the flaw in Bridges' argument. How he is perceived by the public—or more to the point, whether consumers were likely to have believed he was touting his own opinions in the advertisements—is of course *not* a question this Court can resolve from the pleadings without even having seen or read the advertisements.[7]

Moreover, even if those advertisements were to reveal Bridges did not *say* he was expressing his personal opinion, that would not preclude a finding that consumers were likely to have *believed* he was doing so. Nor is such a finding precluded because Bridges is not a recognized financial expert—only an actor. On that score Example 2 in Reg. § 255.5 describes a film star (not a chef) endorsing a food product, specifically characterizes the star as an "endorser" and says the endorsement must comply with Reg. § 255.1(a)'s prohibition against deceptive representations. Bridges' motion to dismiss on the ground he was not an endorser is denied.

2. *Endorsers' Liability under the Illinois Act*

Next Bridges Mem. 6 urges the Complaint fails to state a claim because the Illinois Act does not provide a right of action against endorsers. As the earlier-quoted language of Illinois Act § 270(a) reflects, "any person" may bring an action against "any other person" who violates the Illinois Act and causes damage to the first person. Illinois Act § 271(a) requires that the Illinois Act's provisions be "liberally construed." That really leaves no room at all for disallowing actions against Act-violative endorsers.

What Bridges really means when he says there is no "right of action" against endorsers is that a person who fits the FTC definition of "endorser" cannot *violate* Illinois Act § 262, hence cannot be subjected to liability. That state law section, it will be recalled, declares unlawful the use of deceptive practices "in the conduct of any trade or commerce." Bridges Mem. 6 says endorsers such as Bridges are not engaged in "the conduct of any trade or commerce" (within the meaning of Illinois Act § 262) when they endorse another's product:

> The wording of Section 262 clearly indicates that any claims consumers may have under the [Illinois Act] shall be directed against sellers of merchandise or those who have a direct financial interest in the sale or distribution of the advertised product or service. Obviously, it is the seller of merchandise who would be using deceptive practices in the conduct of its trade or commerce, namely, the advertising and sale of its merchandise.[8]

That construction of the Illinois Act finds support neither in the Act's language nor in the case law. First of all, the language in Illinois Act § 262 in no way "clearly indicates" consumers may assert claims only against actual sellers or those with a direct financial interest in the sale or distribution of the product. In advancing that argument Bridges simply ignores the definition of the terms "trade or commerce" in Illinois Act § 261(f):

> The terms "trade" or "commerce" mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or com-

---

7. If the advertisements were provided for review, there is a serious question whether the issue would be one of law for the court rather than a factual matter to be resolved by the jury. After all, Reg. § 255.0(b) is framed in terms of what "consumers are likely to believe"—and that certainly sounds like a matter for determination by the factfinder (unless no reasonable consumer could have held a particular belief).

8. [Footnote by this Court] Bridges R.Mem. 8 says Act § 261(a)'s definition of "advertisement" also supports his proposed construction of Act § 262—though he fails to explain why. "Advertisement" is defined this way:

> The term "advertisement" includes the attempt by publication, dissemination, solicitation or circulation to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise....

merce directly or indirectly affecting the people of this State.

There are two ways in which someone in Bridges' position may fairly be characterized as having engaged in deceptive practices (the challenged advertising) "in the conduct of any trade or commerce." First of all, Bridges can unquestionably be viewed as having done what he did "in the conduct of [Obie's and Diamond's] trade or commerce." That both accurately portrays his role as a pitchman for the companies and tracks the statutory language. But even were that not so, the statutory definition of "trade or commerce" embraces "advertising" as well as "sale"—and advertising is precisely what an endorser does, whether or not he has a direct financial interest in the sale of the endorsed product. Bridges would have this Court amend the statute so that "trade or commerce" would mean not simply advertising of "any services" or "any property"—the way the statute reads—but one's *own* product or a product one has a direct financial interest in selling or distributing.[9]

Bridges thinks his distorted reading of Illinois Act § 262 is supported by cases applying the Federal Act.[10] It is not. Advertising agencies are not "sellers" (as Bridges employs that term), yet they have frequently been found liable under the Federal Act for committing deceptive acts while advertising another's products. FTC's opinion in *Bristol-Myers Co.*, 102 F.T.C. 21, 364 (1983) described the standard for holding advertising agencies liable this way:

> In order to hold an advertising agency liable for false advertising, the agency

must have been an active participant in preparing the violative advertisements, *Doherty, Clifford, Steers & Shenfield, Inc. v. F.T.C.*, 392 F.2d 921, 927 (6th Cir.1968); *American Home Products*, 98 F.T.C. [136,] 396 [1981], and it must have known or had reason to know that the advertisements were false or deceptive. *Doherty*, 392 F.2d at 927; *Standard Oil Co.*, 84 F.T.C. [1401,] 1475 [1974].[11]

Where those requirements have been met, courts have rejected advertising agencies' pleas that they were mere agents who had unknowingly carried out the orders of the principal advertiser/seller. *Doherty*, 392 F.2d at 928–29; *Carter Products, Inc. v. FTC*, 323 F.2d 523, 533–34 (5th Cir.1963). As *Colgate-Palmolive Co. v. FTC*, 326 F.2d 517, 523–24 (1st Cir.1963), *rev'd*, 380 U.S. 374, 395, 85 S.Ct. 1035, 1048, 13 L.Ed.2d 904 (1965) put it:

> We see no reason why advertising agencies, which are now big business, should be able to shirk from at least prima facie responsibility for conduct in which they participate.

Nowhere in those cases does FTC, or do the courts, say anything about holding liable only those non-seller advertising agencies with a "direct financial interest" in the sale or distribution of a product. In fact Bridges R.Mem. 15 attempts to distinguish the advertising agency cases on a quite different ground:

> In both cases [*Carter* and *Doherty* ], the advertising agencies were acting as agents of the [sellers] in conceiving and creating the advertising campaigns.

---

**9.** Even on Bridges' own terms, he glosses over the obvious fact that celebrities who put their names and faces on the line for a product or service do so not for love but for money. Just how to distinguish that kind of financial interest from any other—a distinction not at all implicit in the statute—would pose its own problems as a matter of statutory construction (and see n. 14 as to a related issue under the Federal Act).

**10.** Neither side has located any Illinois cases examining the issues posed here.

**11.** [Footnote by this Court] Actually the test for liability as stated in *Doherty*, 392 F.2d at 928

was whether the advertising agency had "actually participated in the deception" by knowing or having reason to know of the falsity of the advertising. *Standard Oil Co. of California v. FTC*, 577 F.2d 653, 659 (9th Cir.1978) later cited *Doherty* for this proposition:

> The standard of care to be exercised by an advertising agency in determining what express and implied representations are contained in an ad and in assessing the truth or falsity of those representations increases in direct relation to the advertising agency's participation in the commercial project.

So much then for Bridges' "direct financial interest" test as applied to non-seller advertising agencies.

Endorsers too have been charged with Federal Act violations, though in far fewer cases than advertising agencies. This Court is aware of only three such cases: [12]

1. actor Pat Boone ("Boone") for endorsing an acne product, *Cooga Mooga, Inc.*, 92 F.T.C. 310 (1978), *modified* 98 F.T.C. 814 (1981);

2. former astronaut Gordon Cooper ("Cooper") for endorsing a fuel-economy device for automobiles, *Cooper*, 94 F.T.C. 674 (1979); and

3. dermatologist Dr. Harvey Glass ("Glass") for endorsing an acne product, *Glass*, 95 F.T.C. 246 (1980).

Because there are so few endorser cases and because none enunciates a formal rule of liability, some detailed review is in order.

In each of the three cases FTC issued a complaint saying it had reason to believe the endorser had violated the Federal Act (*Cooga Mooga*, 92 F.T.C. at 674; *Cooper*, 94 F.T.C. at 310; *Glass*, 95 F.T.C. at 246). Each complaint then alleged the endorser had (in conjunction with others) disseminated, published and distributed advertisements. That general allegation was followed by a specific description of how the endorser had "aided" the promotion: in each instance, by providing an endorsement (*Cooga Mooga*, 92 F.T.C. at 311; *Cooper*, 94 F.T.C. at 675; *Glass*, 95 F.T.C. at 247). Additionally Boone was alleged to have "received a share of the product's sales" (*Cooga Mooga*, 92 F.T.C. at 311), while Cooper was alleged to have been compen-

sated based "upon the number of products sold" (*Cooper*, 94 F.T.C. at 675).

Each endorser settled his case by entering into a consent order, agreeing to cease and desist from committing the allegedly deceptive practices but not admitting liability under the Federal Act. Those consent orders are similar in two respects:

1. Each of the three ordered the endorser to cease and desist from making certain misrepresentations unless the endorser had made a "reasonable inquiry" into the truthfulness of the endorsement.[13] In *Glass*, FTC expressly required that the endorser (95 F.T.C. at 253):

shall have an affirmative defense to a compliance suit for violation of this order paragraph where [he] acted only as an endorser and neither knew nor should have known that the advertisement(s) violated the order paragraph.

2. In both *Cooga Mooga* and *Cooper* the consent orders required the endorser to disclose any "material connection" between the endorser and seller/advertiser. *Cooper* defined a "material connection" this way (94 F.T.C. at 680):

any direct or indirect economic interest in the sale of the product or service which is the subject of this endorsement other than (1) a fixed sum payment for the endorsement, all of which is paid before any advertisement containing the endorsement is disseminated, or (2) payment for the endorsement which is directly related to the extent of the dissemination of advertising containing it[.] [14]

---

**12.** This Court's law clerk inquired of FTC as to any other endorser cases and was advised by an FTC attorney that there are none.

**13.** See Appendix for the manner in which each consent decree stated that requirement.

**14.** [Footnote by this Court] No doubt this language (and similar language in *Cooga Mooga* ) is the source of Bridges' proposed "direct financial interest" test. But of course the language did not purport to state such interest as a condition of "endorser" status—merely as a relevant matter for *disclosure.* And even in that limited respect, FTC no longer considers such a financial interest relevant. After the consent orders

in *Cooga Mooga* and *Cooper* had been entered into, FTC issued its "Disclosure of material connections" Guideline (Reg. § 255.5):

When there exists a connection between the endorser and the seller of the advertised product which might materially affect the weight or credibility of the endorsement (i.e., the connection is not reasonably expected by the audience) such connection must be fully disclosed. An example of a connection that is ordinarily expected by viewers and need not be disclosed is the payment or promise of payment to an endorser who is an expert or well known personality, as long as the advertiser does not represent that the endorsement was given without compensation.

In addition to those two requirements, the consent order in *Cooga Mooga* required Boone to contribute a pro rata share of any restitution paid to consumers for purchases made during the advertising campaign containing his endorsement (92 F.T.C. at 321–22).

Although none of those cases represents an adjudicated finding of liability or enunciates a formal rule for when an endorser may be held liable under the Federal Act, they do make one thing plain: In FTC's view endorsers may, under certain circumstances, violate the Federal Act. Bridges R.Mem. 11 (emphasis in original), interpreting the *Cooga Mooga* and *Cooper* decrees (Bridges was apparently unaware of *Glass* ), says those circumstances are twofold:

> the reason for imposing liability [sic—the endorsers were merely charged, not found liable] was their *direct financial interest* in the sale of the product *and their roles in controlling the practices* of the advertiser/seller company.[15]

Even were that a correct reading of the FTC cases (as it cannot be for the reasons already discussed and to be discussed hereafter), Ramson's Complaint would still have survived Bridges' motion to dismiss, for it cannot be determined from the pleadings whether Bridges:

1. had any financial interest in the sale of the product (that is, whether he was paid on a commission basis); and

2. "controll[ed] the practices of the advertiser/seller company."

Issuance of that Guideline led FTC to grant Boone's petition to delete from his consent order the disclosure of a financial interest requirement. FTC observed in that regard (*Cooga Mooga,* 98 F.T.C. at 815):

> The Commission has determined that under this Guide, advertisers are not required to disclose that celebrity endorsers are compensated for endorsements, regardless of the method of compensation. This is because the Commission believes that the manner in which celebrities are compensated does not materially affect the weight or credibility of an endorsement. The Commission further finds that the adoption of the material connection Endorsement Guide constitutes a change in the law regarding the obligation of

Ramson of course would not have been privy to such information and therefore could not have alleged it in her Complaint. Accordingly the motion to dismiss would have had to be denied in any event.

But all this discussion of Bridges' dual requirements for liability is plainly dealing with a straw man. As n. 14 explains, FTC no longer considers it relevant, even for disclosure purposes (let alone as a condition of endorser liability), that an endorser has a financial interest in the sale of a product. Nor is there any real basis for saying FTC requires endorsers to have had a role in "controlling the practices" of the seller: It is not possible to determine from the FTC decrees in the endorser cases whether the endorsers even played such a role, much less whether that role led FTC to charge the endorsers with violations of the Federal Act.

It is exceedingly clear, then, that Bridges' motion must fail even on assumptions favorable to him.[16] It is thus unnecessary at this point to try to set out the exact circumstances under which an endorser such as Bridges may be held liable under the Illinois Act. That issue is more appropriately left for another day.

But one further cautionary note on that score is important. As the Illinois courts have consistently interpreted the Illinois Act, it renders even innocent misrepresentations actionable. *Warren v. LeMay,* 142 Ill.App.3d 550, 566, 96 Ill.Dec. 418, 428, 491 N.E.2d 464, 474 (5th Dist.1986) (citations omitted, emphasis in original) explained:

> celebrity endorsers to disclose their financial interest in the sale of the advertised product.

**15.** [Footnote by this Court] As before, Bridges deviates somewhat from his own earlier-enunciated mere "direct financial interest" test.

**16.** One such implicit assumption is that the Illinois Act's cross-reference to the Federal Act (requiring that "consideration shall be given" to interpretations under that Act) means that conduct nonactionable under the Federal Act is necessarily nonactionable under the broad Illinois statutory language. Neither party has addressed that question, and this opinion has simply assumed such a one-to-one correlation arguendo.

Under the statute, state of mind is immaterial, and a defendant need not be motivated by an intent to deceive.... Even innocent misrepresentations may be actionable.... By its own terms, the statute requires only that a violator intend for a purchaser to *rely* on his acts or omissions. A party is considered to intend the necessary consequences of his own acts or conduct.

Under that statement of principle, Bridges may be liable under Illinois Act § 262 (assuming all the elements of the cause of action are established) even if he neither knew nor should have known of the falsity of the representations made.

FTC applied a different standard in reaching agreement on the *Glass* consent order, which said the endorser would not violate the order if he had neither actual nor constructive knowledge of the falsity of representations made (95 F.T.C. at 253). As already stated, Illinois Act § 262 requires courts (when construing that section) to consider FTC's interpretation of the Federal Act. In light of that provision, it is perhaps conceivable that an Illinois appellate court might conclude (were the question posed to it) that:

1. FTC considers endorsers potentially liable under the Federal Act only if they had knowledge the advertisements were false.

2. Illinois Act § 262 should therefore also be construed to require such knowledge.

But as to state-law-based claims such as those under the Illinois Act, this Court's role is not one of expanding the judicial horizon beyond that delineated by the state court system. Our Court of Appeals has continued to make that point in such cases as *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987) (per curiam), declaring its "unwillingness to speculate on any trends in state law"[17]; and see most recently *Gust K. Newberg Construction Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987). That rule has special force where (as here) the only potential source

for creating a requirement of *knowing* deception—in the face of well-established and consistent state-law precedent negating any such requirement—is a few consent decrees (not adjudications) in FTC cases.

### Rule 9(b) "Particularity"

■ Each of Yaffe and Bridges urges Ramson has failed to satisfy Rule 9(b)'s directive that "the circumstances constituting fraud ... shall be stated with particularity." Before this opinion can turn to the asserted deficiencies in that regard, it must deal with the threshold question whether Rule 9(b) even applies to the federal-court assertion of claims under the Illinois Act. On that score, neither side has identified (nor has this Court found) any case treating that question.

Ramson/B Mem. 3 reasons Rule 9(b) does not apply because "proof of fraud is not necessary for maintaining a claim under the [Illinois Act]." If Ramson simply means a violation of that Act does not equate to the commission of common law fraud, she is right (*Mack v. Plaza Dewitt Limited Partnership*, 137 Ill.App.3d 343, 350, 92 Ill.Dec. 169, 175, 484 N.E.2d 900, 906 (1st Dist.1985)). But an Illinois Act violation (like common law fraud) requires proof of a misrepresentation of a material fact (*id.; People ex rel. Fahner v. American Buyers Club, Inc.*, 115 Ill.App.3d 759, 761, 71 Ill.Dec. 216, 218, 450 N.E.2d 904, 906 (3d Dist.1983); *Graphic Sales, Inc. v. Sperry Univac Division*, 824 F.2d 576, 580 (7th Cir.1987)). Where the Illinois Act and a fraud action part company is in the absence of "the defendant's intent [as] an element of a cause of action under the Act" (*id.*, at 580 & n. 3).

Rule 9(b)'s requirement of particularity in stating "the circumstances constituting fraud" plainly looks to defendant's alleged misrepresentations, not to defendant's state of mind. Thus an action under the Illinois Act—like an action for common law fraud—is one in which (*Tomera v. Galt*, 511 F.2d 504, 508 (7th Cir.1975)) "slightly more" than the information required under

---

**17.** That concept is of course most frequently encountered as an application of *Erie v. Tomp-* *kins* principles, but it has equal force whenever state law provides the rule of decision.

Rule 8 is called for: Simply alleging the bare elements of a cause of action will not sufficiently identify the alleged wrongful conduct as to enable the defendant to prepare a defense. Allegations in the Complaint must therefore satisfy Rule 9(b)'s particularity requirement (see *Barr Co. v. Safeco Insurance Co. of America*, 583 F.Supp. 248, 258 (N.D.Ill.1984)).

Both Bridges and Yaffe offer various reasons why the Complaint fails to do the job. Only one of them merits serious discussion. Bridges Mem. 3 observes (as does Yaffe Mem. 5 in substantially the same language):

> With respect to the print advertisements, [Ramson] does not allege what publishing forums were used, the dates of such print advertisements, the geographical area of distribution of the published matter or the substance of the advertisements. With respect to the alleged television and radio advertisements, [Ramson] does not specify the dates such advertisements were aired, the stations responsible for airing them, the geographical locations to which they were aired or the substance of such advertisements.

Ramson is of course perfectly right in responding Bridges and Yaffe already know all that information or at least have access to it, while she does not. This Court will not put Ramson into the Catch–22 situation of having to plead that level of particularization until she can do so on the basis of discovery she must obtain from defendants.

But what Bridges and Yaffe do not know (and Ramson may) is which of those advertisements *Ramson* saw or read and then relied on. To the extent (1) Yaffe prepared, or Bridges gave endorsements in, more than one advertisement *and* (2) there are material differences among the advertisements, Yaffe and Bridges will need to know which advertisements Ramson actually saw or read.[18]

Again Ramson's ability to provide definitive allegations in that respect may have to await the obtaining of some information via discovery. However, to the extent Ramson is able to, she will have to provide the following information (in a Fourth Amended Complaint) regarding the advertisements she actually saw or read:

1. the medium in which each advertisement appeared: television, radio or print (and if the latter, the magazine or newspaper in which Ramson read the advertisement);

2. the approximate time period when she saw, heard or read each advertisement and where she was (the city) when she did so; and

3. the substance of each advertisement.

Of course all that information may prove to be irrelevant if there are no material differences among the advertisements Yaffe prepared and Bridges appeared in: What does it matter which of the several advertisements Ramson saw or read if they all contain the same misrepresentations?

Two other amendments to the Complaint are needed. Neither calls for extended discussion.

First, Bridges Mem. 4 notes the Complaint (1) lumps Bridges together with Hamilton and (2) fails to identify any representations made by Bridges. Actually the Complaint alleges *each* of Hamilton and Bridges made the representations identified in ¶ 107. Nonetheless Ramson/B Mem. 7 now says Bridges did *not* say "Diamond was a corporation 'you could count on'" (¶ 107(d))—someone else did. Ramson should amend the Complaint to reflect that.

Second, ¶ 107 does not specify whether each of the alleged misrepresentations it describes was made in an advertisement. Although that seems most likely in view of the allegations, ¶ 107 (emphasis added) is unclear in that regard:

> Defendants, Hamilton and Bridges, *by promoting and selling [Obie] securities and by providing mortgages through Diamond advertisements*, violated the [Act] through the following false, unfair, fraudulent and deceptive practices:

---

18. It may turn out, for example, that the advertisements Ramson relied on *did not* contain any misrepresentations, while only those she never saw or read *did*.

Ramson should amend the Complaint to clarify whether Bridges' and Yaffe's alleged misrepresentations were made exclusively in advertisements.

Equally short shrift is due the rest of the purported deficiencies in the Complaint. Only the result is different: Yaffe and Bridges lose on them, just as they won on the two minor items already discussed.

For one thing, even though ¶ 170 sets out exactly what misrepresentations Yaffe allegedly made, Yaffe Mem. 6 claims:

> It is impossible for Yaffe to determine which of the alleged misrepresentations or omissions to [Ramson] for which it is responsible.

That is so, Yaffe Mem. 6 contends, because ¶ 107 alleges Bridges and Hamilton made those same misrepresentations and thus (sic) the Complaint has "lumped" those three defendants together. That is insupportable—the Complaint adequately apprises Yaffe of the specific misrepresentations it allegedly made.

Bridges suggests three other reasons why Rule 9(b)'s particularity requirement is not satisfied, saying the Complaint:

1. does not explain how any representations made by Bridges were deceptive or fraudulent (*id.* at 3);

2. does not allege Bridges had knowledge of material facts he allegedly failed to disclose (*id.* at 4); and

3. alleges Ramson relied on the advertisements of Bridges and Hamilton in investing with Obie, thus "directly contradict[ing]" the allegation she relied on Obie account executive Marks' representations (*id.* at 3–4).

None of those deserves more than a brief response.

First, ¶ 107(g) makes it quite plain why Obie and Diamond were allegedly not reliable companies (¶ 107(b)), offering "conservative" investments (¶ 107(c)) backed by

mortgages on real estate (¶ 107(e)).[19] It is absurd for Bridges to contend he cannot determine from the Complaint why the representations he assertedly made (set out in ¶ 107) were assertedly fraudulent.

Nor is there any basis—at least under Rule 9(b)—for Bridges' seeking dismissal because the Complaint does not allege Bridges had knowledge of the material facts he ˙ allegedly failed to disclose (¶ 107).[20] If Bridges instead means to say dismissal is warranted because the Complaint (lacking that allegation) fails to state a claim, he should develop the argument and support it with case law.[21] Finally, it is not at all contradictory for Ramson to allege she relied on both Marks' representations and Bridges' endorsements in investing her money with Obie.

■ In sum, the Third Amended Complaint is deficient for failure to satisfy Rule 9(b)'s particularity requirement. Nonetheless, because Ramson's ability to cure the deficiencies will likely depend on discovery production from defendants, Yaffe and Bridges are not now dismissed from the Complaint.

### Conclusion

This Court is necessarily uncertain as to when the necessary Fourth Amended Complaint (curing the pleading deficiencies outlined in this opinion) can be filed. That subject will be addressed at the previously-scheduled August 31, 1987 status hearing.

### APPENDIX

Each of the consent decrees in the three FTC endorser cases framed the requirement of reasonable inquiry in somewhat different language. More importantly, however, examination of that language discloses no difference in the underlying principle. *Cooga Mooga*'s consent order de-

---

**19.** Ramson/B Mem. 8 says that information is provided by ¶¶ 43–45, but those paragraphs do not allege misconduct on Bridges' part.

**20.** Nothing in this opinion should be read as suggesting any ruling on whether specific matters alleged in Complaint ¶¶ 107 and 170 (such

as, for example, the claimed omissions) would qualify as "misrepresentations."

**21.** Bridges should keep in mind, however, that ¶ 107(h) alleges he failed properly to investigate Obie or Diamond before endorsing those companies.

scribed the requirement this way (92 F.T.C. at 317):

> [R]espondents [must] make a reasonable inquiry into the truthfulness of a proposed endorsement and possess and rely upon information from reliable sources independent of the advertiser or other parties with an interest in the product or service which is the subject of the endorsement. For purposes of this provision "information" may include tests or studies in the possession of the advertiser; however, such information must be independently evaluated by reliable sources in order to provide a basis for an endorsement. For products or services not related to health or safety, respondents may rely on the personal experience of the endorser where the evaluation of such products or services, for purposes of any endorsement, requires no professional expertise and such products or services can be reasonably evaluated through lay use.

*Cooper* enunciated a slightly different inquiry, forbidding an endorsement unless (94 F.T.C. at 681):

> a. when [Cooper's] endorsement pertains to subject matter falling within [his] area of expertise, at the time of the first dissemination of such endorsement, [he] possesses and relies upon reliable scientific evidence to substantiate any representation made directly or by implication in the endorsement; or
>
> b. in all other cases, at the time of the first dissemination of such endorsement, [Cooper] has made a reasonable inquiry into the truthfulness of the endorsement, and possesses and relies upon information resulting from such inquiry which substantiates any representation made directly or by implication in the endorsement.[1]

Finally *Glass* forbade the endorser from (95 F.T.C. at 252–53):

> 1. making representations unless he "possesse[d] and relie[d] upon competent and reliable scientific or medical evidence

as a reasonable basis for such representations";[2] and

> 2. misrepresenting "the extent to which any product had been tested or the results of any such tests."

---

**1.** Again "reasonable inquiry" had to involve independent verification—this time by "at least two competent and reliable sources."

**2.** Here too at least two independent sources were required.