See also, Bkrtcy., 118 B.R. 583, and 118 B.R. 588.

In re DIAMOND MORTGAGE CORPORATION OF ILLINOIS, an Illinois corporation, d/b/a Diamond Financial Services, Inc., I.D. # 36–3144958, Debtor.

John ARAMOWICZ, et al., Plaintiffs,

v.

Lloyd BRIDGES, et al., Defendant.

Bankruptcy No. 86 B 13066.
Adv. No. 87 A 76.

United States Bankruptcy Court,
N.D. Illinois, E.D.

July 12, 1989.

Jerome S. Lamet, Stephanie W. Kanwit, Margaret F. Woulfe, Lamet, Kanwit & Associates, Chicago, Ill., for plaintiffs.

Ronald L. Futterman, Phyllis L. Crocker, Hartunian, Futterman & Howard Chtd., Chicago, Ill., for Yaffe.

Daniel R. Formeller, Jacqueline A. Criswell, Tressler, Soderstrom, Maloney & Priess, Chicago, Ill., for Bridges.

Lowell E. Sachnoff, Sara R. Wolff, Stuart J. Chanen, Sachnoff, Weaver & Rubenstein Ltd., Chicago, Ill., for Hamilton.

## AMENDED MEMORANDUM, OPINION AND ORDER

ROBERT E. GINSBERG, Bankruptcy Judge.

This matter comes to be heard on defendant Lloyd Bridges' ("Bridges"), motion for summary judgment. The Court has jurisdiction over the proceeding pursuant to 28 U.S.C. § 1334 and Local Rule 2.33 of the United States District Court of Illinois referring bankruptcy cases and proceedings to this Court. This is a noncore proceeding under 28 U.S.C. § 157(c)(1). The following constitutes the Court's recommended findings of fact and conclusions of law. For the reasons contained herein, Bridges' motion is denied.

### Facts

The Court is all too familiar with the facts of this case. Diamond Mortgage Corporation of Illinois, ("Diamond"), was an Illinois corporation and licenced mortgage

broker. Diamond was in the business of loaning money to consumer homeowners and primarily lent money to high risk consumer borrowers. All of Diamond's loans were secured by a first mortgage on the borrowers' homes. Diamond attracted borrowers through general advertisements, several which featured actor George Hamilton.

Diamond, however, had no independent source of capital. The money Diamond used for its mortgage loans came from an affiliated corporation, A.J. Obie and Associates, Inc., ("Obie"), another Illinois corporation. Obie, in turn, raised the money that it advanced to Diamond through an aggressive television advertising campaign which included commercials featuring actor Lloyd Bridges.

The theory behind the structure of the Obie transactions was that each investment was to be matched with one or more specific Diamond mortgages. It was the investors' understanding that an investor would give his/her money to Obie which in turn would lend the investor's money to Diamond. Diamond would lend the funds to the borrower who would sign a note agreeing to repay the funds plus interest. The borrower would also give Diamond a mortgage interest in the borrower's home as security for the note. Diamond would transfer the note and mortgage to Obie. Obie would then assign this mortgage to the investor. When an investor was matched to one or more mortgages representing the amount of the investment, the investor became the mortgagee to Diamond's borrower. Diamond was to continue to service the mortgage for the investor for a fee based on a percentage of the borrower's payments. The notes carried a high interest rate, usually 15% or more, which in theory enabled the investor to get a generous return on his/her investment even after Diamond's service fees was taken out of the monthly mortgage payment.

This was the theory. Unfortunately, the theory was not generally applied in practice. The money invested in Obie usually did not go toward funding Diamond mortgages. Instead, as the plaintiffs allege, most of the investors were never matched to mortgages. In a classic Ponzi scheme fashion, apparently most of the investors' money went toward paying off other investors. In addition, allegations have been made that some of the money went to support the lavish lifestyles of certain members of the management of Diamond and Obie.

Not surprisingly, the house of cards came tumbling down in the summer of 1986. On August 25, 1986 Diamond and Obie filed voluntary Chapter 11 petitions. Subsequently, the plaintiffs, all Obie investors, sued the defendant Bridges and several other parties, alleging a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat., ch. 121½, ¶ 261 et seq. (1987).

Bridges brings this motion for summary judgment alleging that there are no material factual disputes and that he is entitled to judgment as a matter of law.

### Standard For Summary Judgment

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c) Fed.R.Civ.P. *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir.1987); *Cameron v. Frances Slocum Bank & Trust Co.*, 824 F.2d 570, 573 (7th Cir.1987); *Shlay v. Montgomery*, 802 F.2d 918, 920 (7th Cir.1986). The primary purpose for granting a motion for summary judgment is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Farries v. Stanadyne/Chicago Div.*, 832 F.2d 374, 379 (7th Cir.1987). On a summary judgment motion the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255, 106

S.Ct. at 2513. Moreover, the existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under applicable law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Howland,* 833 F.2d at 642.

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion by identifying those portions of the "pleadings, depositions, answers to interrogatories, and affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. This is essentially a requirement that the moving party on a motion for summary judgment make a prima facie showing that it is entitled to summary judgment. 10A *Wright, Miller & Kane, Federal Practice & Procedure, Civil,* § 2727. Once the motion is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon the mere allegations or denials in its pleadings, but must show that there is a genuine issue for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. However, if evidence opposing summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

### Discussion

Bridges contends that the plaintiffs, in order to assert a claim under § 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat., ch. 121½ ¶ 261 *et seq.* (1987) ("ICFA"), must prove that: 1) the plaintiffs relied on the statements made by Bridges in the Obie advertisements; 2) the statements made by Bridges in the Obie commercials rise to the level of actionable misrepresentations as a matter of law; 3) Bridges was an endorser of Obie securities; 4) Bridges was an expert endorser of Obie securities; 5) Bridges derived a direct financial benefit from the sale of Obie securities; 6) Bridges actively participated in the preparation of the Obie ads and knew or should have known those ads contained false statements; and 7) the statements made by Bridges in the Obie ads were the proximate cause of the plaintiffs' alleged injuries. According to Bridges, because the plaintiffs cannot prove any of these elements and there are no material facts in issue, he is entitled to judgment as a matter of law.

The plaintiffs respond that Bridges has mischaracterized the necessary elements that plaintiffs must prove in order to establish a claim under the ICFA. Moreover, the plaintiffs allege that there remain genuine issues of material fact in dispute. Principally, the plaintiffs assert that it is a question of fact whether Bridges knew or should have known that some of the statements he made in the Obie commercials were not true. The plaintiffs claim that these facts support the inference that Bridges should have known that some of his statements on behalf of Obie were not true.

The starting point of the Court's analysis is § 2 of the ICFA which provides:

§ 2. Unfair methods of competition and unfair deceptive acts or practices including but not limited to the use or employment of any deception, fraud, false pretenses, false promise, misrepresentation or the concealment, suppression or omission of any material fact with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

Ill.Rev.Stat., ch. 121½, ¶ 262 (1987).

To establish a violation of the ICFA, a plaintiff must show a misrepresentation, concealment or omission, of a material fact with the intent that others rely on that fact. *Kleidon v. Rizza Chevrolet, Inc.,* 173 Ill.App.3d 116, 122 Ill.Dec. 876, 527 N.E.2d 374 (1988). In order to be considered material, the concealed fact must

have been such that had the other party known of it, he would have acted in a different manner. 122 Ill.Dec. at 878, *Id.* 527 N.E.2d at 376.

The Act provides broader consumer protection than the common law action of fraud since the Act also prohibits any "deception or false promise." *Perlman v. Time, Inc.,* 64 Ill.App.3d 190, 198, 20 Ill. Dec. 831, 838, 380 N.E.2d 1040, 1047 (1978). Illinois courts have followed the legislative mandate that the courts apply the Act to the utmost degree in eradicating all forms of deceptive and unfair business practices and grant appropriate remedies to injured parties. *Duhl v. Nash Realty, Inc.,* 102 Ill.App.3d 483, 57 Ill.Dec. 904, 914, 429 N.E.2d 1267, 1277 (1981). It is well established under the Act that the seller's intent is not important and a plaintiff may recover under the Act for innocent misrepresentations. *Id.*

Bridges' initial argument is that the plaintiffs did not rely on any Obie commercials in which he appeared. As support, Bridges states that with the possible exception of Mr. and Mrs. Aramowicz, all of the remaining plaintiffs allege that they saw Obie commercials which featured Bridges on dates when no Bridges commercials were broadcast. Bridges repeatedly asserts that December 17, 1984 was the final broadcast date of an Obie commercial in which he appeared. As this Court previously noted in its decision of July 25, 1988, the actual date that each plaintiff saw the advertisements is important in determining whether there was actual reliance. Bridges has apparently interpreted this statement to mean that the dates on which the commercials were broadcast and the dates which the plaintiffs claim to have seen the specific commercials must match exactly in order to establish reliance.

■ The purpose of the pleading requirements of Fed.R.Civ.P. 9(b) is to provide notice to the defendant of the circumstances constituting fraud. 2A J. Moore,

*Moore's Federal Practice* ¶ 9.03 (2d ed. 1987). *Cf. Riverway Co. v. Spivey Marine & Harbor Service Co.,* 598 F.Supp. 909 (S.D.Ill.1984) (the particularity requirement of Rule 9(b) is satisfied whenever the complaint adequately apprises the defendant of his alleged fraudulent acts and evinces plaintiff's reasonable belief that his claim has merit). In the present case, the plaintiffs were required to identify the particular commercials upon which they relied in making their investment decisions and the approximate dates of viewing. What matters is not the exactness of the dates so long as it appears that the plaintiffs viewed the Bridges commercials prior to the time that they invested with Obie. Without exception, each plaintiff recalls viewing the Bridges commercials prior to making his/her decision to invest. The dates they actually saw those ads are not determinative of the question of reliance. Instead, any gap between the actual dates on which the Bridges commercials were seen by the investors and the date of their purchase of Obie securities is relevant to the question of whether they relied on Bridges' commercials in making the purchase. By the same token, the apparent discrepancy of the dates the plaintiffs claim to have seen the ads in their complaint and the dates the ads were run on Chicago television may certainly raise questions of credibility. However, all this produces questions of material fact on the question of reliance. This necessarily leads to the denial of Bridges' motion for summary judgment.

■ The ICFA provides that in construing § 262, courts should consider interpretations of the Federal Trade Commission and the federal courts relating to § 5(a) of the Federal Trade Commission Act. Ill. Rev.Stat., ch. 121½ ¶ 262 (1987).[1] The essence of the plaintiffs' complaint against Bridges is that Bridges allegedly violated the FTC's Guides Concerning Use of Endorsements and Testimonials in Advertis-

---

1. The ICFA is patterned after § 5(a) of the Federal Trade Commission Act, which declares unlawful "unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." 15 U.S.C. § 45(a) (1973). The ICFA, however, unlike the Federal Trade Commission Act, authorizes a private cause of action for deceptive commercial conduct. *See, Crowder v. Bob Oberling Enterprises,* 148 Ill.App.3d 313, 101 Ill.Dec. 748, 499 N.E.2d 115 (1986).

ing ("Guides"). *See* 16 C.F.R. § 255.0 *et seq.* The plaintiffs allege that Bridges was an endorser of Obie and that under the provisions of the FTC Guides, he had an affirmative duty to substantiate the truthfulness of the endorsements and obtain independent and reliable information regarding the financial stability of Obie and Diamond. The plaintiffs contend that Bridges failed to carry out that duty.

Bridges, on the other hand, takes the position that he was not an endorser of either Diamond or Obie, but was merely a spokesperson on behalf of Obie. Bridges asserts that the commercials reflect the view of the sponsoring advertiser, Obie, and not Bridges' personal opinion.

The Court must first look to the FTC's Guides to determine whether Bridges was an endorser.[2] The Guides provide that:

> For purposes of this part, an "endorsement" means any advertising message (including verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization) which message consumers are likely to believe reflects the opinions, beliefs, findings, or experience of a party other than the sponsoring advertiser. The party whose opinions, beliefs, findings, or experience the message appears to reflect will be called the endorser and may be an individual, group or institution.

16 C.F.R. § 255.0(b).

Bridges' advertisements for Obie included the following statements:

"If you're an investor you can't always expect smooth sailing. Security values and yields can change with the weather. But A.J. Obie & Associates offer secured investments that give you the same high yield in fair weather or foul and you get this high yield by check in the mail each month for as long as you own them. Well, you'll want to know more about this rewarding investment opportunity. If you'll listen, A.J. Obie has something important to say."

"Conditions aren't always certain. Sometimes an investor has to chart a new course. But, some investments maintain a high yield in spite of storms in the securities market place. A.J. Obie & Associates offer securities that earn a high yield from the first day of their purchase and you get this yield by check in the mail each month for as long as you own them. Want to know more? Well if you'll listen, A.J. Obie has something important to say."

Clearly, Bridges' statements were an endorsement of Obie, as the advertisements had the capacity to lead reasonable consumers to believe that the statements reflected Bridges' "opinions, beliefs, findings or experience" concerning Obie investments. Bridges did more than merely introduce Obie or just invite the public to call Obie for more information. *See Kramer v. Unitas*, 831 F.2d 994 (11th Cir.1987).[3] And the fact that Bridges did not state that he was expressing his personal opinion does not preclude a finding that consumers were likely to have believed he was doing so. *Ramson v. Layne*, 668 F.Supp. 1162 (N.D.

2. In another lawsuit arising out of these same facts, Bridges was found to be an endorser of Obie. *Ramson v. Layne*, 668 F.Supp. 1162, 1165–70 (N.D.Ill.1987).

3. In *Kramer v. Unitas*, the court found that Unitas said nothing which constituted a "representation". However, the holding of that case has little application to the instant case as the facts differ significantly. Unitas performed as a spokesman in radio spots for a mortgage/investment broker. In the commercials, Unitas identified himself as a famous football player and introduced his "friends at First Fidelity." After a representative of First Fidelity announced that "you can earn up to 18.33% annual yield;" that the investment purchase

"may be insured" and that the company meets "all prudent man requirements", Unitas reappeared and closed the commercial by inviting the public to call First Fidelity for additional information. *Kramer v. Unitas*, 831 F.2d 994, 995–96 (11th Cir.1987). Both the district court and the 11th Circuit found that although Unitas' voice may have initially caught the plaintiffs' attention, nothing he said or did constituted a "representation" which would support the plaintiffs' fraud claims, but merely invited further inquiries. *Id.*, at 998–99. In addition, *Unitas* was a common law fraud case. The instant case is not. Contrast *Ramson*, 668 F.Supp. at 1166–1170.

Ill.1987). The test is what "consumers are likely to believe". *Id.* at 1165 (compares Bridges' commercials to Example 2 in Reg. § 255.5 of the FTC Guides which describes a film star who was not a chef endorsing a food product, and specifically characterizes the star as an "endorser").

■ Bridges next argues that even if he is deemed an endorser of Obie investments, the plaintiffs must establish that he was an expert in the field. In support of that proposition Bridges cites three FTC consent decrees involving endorsers, which according to Bridges set the standard of endorser liability where the endorser[4] is an "expert."

Bridges, however, has misinterpreted the Guides. An "expert" is defined as "an individual, group, or institution possessing, as a result of experience, study or training, knowledge of a particular subject, which knowledge is superior to that generally acquired by ordinary individuals." 16 C.F.R. § 255.0(d). Nowhere in the Guides does it state that in order for an endorser to be liable, he/she must be an "expert endorser". Rather, § 255.1 speaks in general terms as to the responsibility of an endorser. Section 255.1 provides in pertinent part that:

> Endorsements must always reflect the honest opinions, findings, beliefs, or experience of the endorser. Furthermore, they may not contain any representations which would be deceptive or could not be substantiated if made directly by the advertiser.

16 C.F.R. § 255.1(a).

It is evident that § 255.1 does not differentiate between the liability of an "endorser" and an "expert endorser", and this Court will not give the Guides such an interpretation. Moreover, the FTC cases Bridges cites do not support his proposition. In those cases the endorser was promoting a product in which the endorser was perceived to possess superior knowledge. For example in *Cooper*, 94 F.T.C. 674 (1979), former astronaut Gordon Cooper was endorsing a fuel-economy device for automobiles. And in *Glass*, 95 F.T.C. 246 (1980), dermatologist Dr. Harvey Glass was endorsing an acne medication. In this case, unlike the FTC cases, Obie did not portray Bridges as an expert on investments. Nor do the plaintiffs allege that Bridges was an expert in the field of securities. The case at bar is analogous to the example cited in § 255.5 where a film star endorses a particular food product. The example provides that this endorsement must comply with § 255.1's prohibition against deceptive representations. 16 C.F.R. § 255.5 Example 2. Similarly in this case, Bridges had a duty as an endorser of Obie not to make any representations which would be deceptive.

■ Bridges next argues that the statements he made in the Obie commercials do not contain actionable misrepresentations as a matter of law, as his statements in the *Fair Weather* and *Foul Weather* commercials merely introduce the company and invite the public to call Obie for further information. Bridges supports this argument by again attempting to analogize the instant case to the facts in the *Unitas* case. However, as discussed above, Bridges' statements went beyond the "puffing" in *Unitas* as Bridges' statements portraying an investment in Obie to be safe regardless of fluctuations in the securities markets were meant to lead an investor to conclude that Obie would produce high yields with little risk. That is vastly different than saying, "These people are my friends and they have a good deal for you." It is an endorsement of the quality of those investments. If he was going to tell people that, he should have taken reasonable steps to ascertain what he was saying was true.[5]

---

4. Bridges cites *Glass*, 95 F.T.C. 246 (1980) (a dermatologist stated that he developed the special acne medication); *Cooga Mooga, Inc.*, 92 F.T.C. 310 (1978), *modified* 98 F.T.C. 814 (1981) (Pat Boone stated that his daughters used the acne medication); and *Cooper*, 94 F.T.C. 674 (1979) (an astronaut stated that he had examined the fuel-economy device which was installed in his wife's car).

5. Bridges claims that Judge Shadur questioned whether the statements contained in the commercials constitute "representations." Judge Shadur raised the question during a status hearing in the *Ramson* case. The issue was never

The next issue is whether, in order to assert a claim under the ICFA and the FTCA, the plaintiffs must prove that Bridges derived a direct financial benefit from his alleged misrepresentations and omissions. Bridges contends that the FTC consent decrees suggest that for an endorser to be liable under the FTCA or the ICFA, he or she must have a direct financial interest related to the actual sale of the product.

The court must again reject Bridges' argument. In *Ramson v. Layne, supra,* Judge Shadur was presented with the same contention that Bridges did not have a financial interest in his advertisements for Obie. Bridges relied on the language of the FTC consent decrees as the basis for this test.[6] Judge Shadur, however, found that the language in those cases "did not purport to state such an interest as a condition of 'endorser' status—[financial interest is important] merely as a relevant matter for *disclosure.*" 668 F.Supp. at 1168 n. 14. Judge Shadur further noted that the FTC no longer considers it relevant, even for disclosure purposes, that an endorser has a financial interest in the sale of a product, as "the Commission believes that the manner in which celebrities are compensated does not materially affect the weight or credibility of an endorsement." 668 F.Supp. at 1169, *citing Cooga Mooga,* 98 F.T.C. at 815. This Court finds Judge Shadur's reasoning persuasive and finds that the FTCA does not require an endorser to have a financial interest in the sale of the product in order to establish said endorser's liability under the FTCA.

Bridges next contends that he was not an active participant in the preparation of the Obie commercials and therefore summary judgment should be granted in his favor. While Bridges apparently was not an active participant in the preparation of the Obie commercials, that is irrelevant to the question of liability as an endorser. Bridges cannot defend this lawsuit by simply saying, "I was reading somebody else's words." [7]

A question of fact remains as to whether Bridges, as an endorser, satisfied the duty imposed upon him by the FTC Guides to substantiate the truthfulness of the endorsements and obtain independent and reliable information regarding the financial stability of Obie. Bridges contends that he had no duty to inquire since he does not consider himself an endorser. However, as both this Court and Judge Shadur have previously held, it doesn't matter what Bridges considered his role to be. It was what his role was in fact that controls. Bridges was an endorser for Obie and therefore had a duty to make an independent inquiry of Obie to determine the truthfulness of the messages he delivered on its behalf pursuant to 16 C.F.R. § 255.1. Bridges apparently relied on his agents and business manager to inquire into the legitimacy and viability of Obie. However, factual questions remain as to the extent of the efforts made by Bridges and/or his agents and the nature of the information discovered by those efforts in order to determine whether that duty has been discharged.

Finally, Bridges argues that summary judgment should be granted as he was not a proximate cause of the plaintiff's injuries. It is fundamental to an

resolved in the *Ramson* case. At best, as indicated by Judge Shadur, a question of material fact remains as to whether the statements made by Bridges in the Obie commercials contain actionable misrepresentations.

6. The consent order in *Cooga Mooga* and *Cooper* required the endorser to disclose any "material connection" between the endorser and seller/advertiser. "Material connection" was defined in *Cooper* as:

any direct or indirect economic interest in the sale of the product or service which is the subject of this endorsement other than (1) a

fixed sum payment for the endorsement, all of which is paid before any advertisement containing the endorsement is disseminated, or (2) payment for the endorsement which is directly related to the extent of the dissemination of advertising containing it. 94 F.T.C. at 680.

7. For example, suppose the words were "Trust me. Lloyd Bridges has checked and Obie is a good safe deal." Obviously, he could not defend by saying "someone wrote those words and I just read them."

analysis of proximate/intervening causes that misconduct on the part of another which might be foreseen is not of itself sufficient to place the responsibility upon the defendant. However, if the defendant has a duty to anticipate the intervening misconduct and guard against it, the intervening act or occurrence cannot supersede his liability. This is true even where the intervening act is an intentional or criminal act which the defendant might reasonably anticipate and against which he would be required to take precautions. The defendant is not liable unless his conduct has created or increased an unreasonable risk of harm through its intervention. W. Prosser & W. Keeton, *The Law of Torts* § 44 (5th ed. 1984).

It is clear from the facts in this case that Bridges was an endorser and therefore had a duty pursuant to the FTC Guides to substantiate the truthfulness of the endorsements and obtain independent and reliable information regarding the financial stability of Obie and Diamond. Therefore, any subsequent intervening acts by Diamond, Obie, or the State of Illinois cannot be used by Bridges to supersede his liability, as it was his own conduct which, in effect, initiated the harm to the plaintiffs.

### Conclusion

The Court finds that genuine issues of material fact remain in dispute. Accordingly, the court will deny Bridges' motion for summary judgment.

IT IS HEREBY ORDERED that defendant Lloyd Bridges' Motion for Summary Judgment is denied.